UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                            :
SHAWN S. LEHAL,                                             :
                                                            :
                                 Plaintiff,                 :          13cv3923 (DF)
                                                            :
                          -against-                         :          **MEMORANDUM AND**
                                                            :          **ORDER**
UNITED STATES of AMERICA, et al.,                          :
                                                            :
                                 Defendants.                :
------------------------------------------------------------------------X

**DEBRA FREEMAN, United States Magistrate Judge:**

Currently pending in this civil rights action, which is before this Court on consent

pursuant to 28 U.S.C. § 636(c), are two motions, made by different sets of defendants, to dismiss

the Second Amended Complaint of *pro se* plaintiff Shawn S. Lehal ("Plaintiff"). Liberally

construed, Plaintiff's pleading primarily asserts claims under *Bivens v. Six Unknown Named*

*Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and 42 U.S.C. § 1983, arising out

of Plaintiff's arrest and detention.[1] In particular, Plaintiff claims that he was subjected to

excessive force at the time of his arrest by defendants Deputy United States Marshal James

Masterson ("Masterson"), and Special Deputy Marshals Robert Martin ("Martin") and Eric King

("King"), causing him to suffer a serious shoulder injury; he further claims that these defendants,

as well as defendants Edward Blanchette, M.D. ("Blanchette"), and the Central Falls Detention

Facility Corporation ("CFDFC"), as operator of the Donald W. Wyatt Detention Facility

---

[1] Although Plaintiff's pleading cites Section 1983, but not *Bivens*, the officers who
arrested him were acting under color of federal law (*see* Discussion, Section II(A), *infra*), and
thus the Court will construe Plaintiff's constitutional claims against those officers as arising
under *Bivens*.

("Wyatt"), demonstrated deliberate indifference to his medical needs by denying him appropriate treatment for his injury, both initially and during the period of his detention at Wyatt. Plaintiff additionally pleads a claim against defendant the United States of America (the "United States") under the Federal Tort Claims Act ("FTCA"), claiming negligence relating to the alleged denial of adequate medical care.[2]

The first of the motions before the Court (Dkt. 62), filed by defendants the United States, Masterson, Martin, and King, seeks dismissal of Plaintiff's FTCA claim as against the United States,[3] dismissal of the excessive-force claim against Masterson, and dismissal of the deliberate-indifference claims against Masterson, Martin, and King. The second motion (Dkt. 80), filed by defendants Blanchette and CFDFC, seeks dismissal of all claims against those two defendants. For the reasons that follow, each of the two pending motions is granted in part and denied in part.

## BACKGROUND

### A. Factual Background

The facts summarized below are taken from the allegations contained in Plaintiff's Second Amended Complaint, the exhibits attached thereto or incorporated therein by reference,

---

[2] Plaintiff also references, in his pleading, the Equal Protection Clause of the 14th Amendment and 42 U.S.C. §§ 1985 and 1986 (relating to conspiracies to violate civil rights), but, as discussed below, he does not allege facts that, even liberally construed, could support an equal-protection or conspiracy claim.

[3] Although the moving brief filed by the arresting officers and the United States argues for the dismissal of Plaintiff's FTCA claim against the United States Marshals Service ("USMS") (*see* Memorandum of Law in Support of Defendants' Partial Motion To Dismiss Plaintiff's Second Amended Complaint, dated Mar. 4, 2015 ("Def. Mem. (1st Mtn.)" (Dkt. 63)), at 6), the Court understands that these movants intended to seek dismissal as against the United States, the proper defendant for Plaintiff's FTCA claim. Indeed, although the USMS was improperly named as a defendant in Plaintiff's initial pleadings (Dkts. 2, 15), the Second Amended Complaint, which is now the operative pleading in this action, correctly asserts the FTCA cause of action against the United States, and does not name the USMS as a defendant (*see* Second Amended Complaint, dated Dec. 2, 2014 ("2d Am. Compl.") (Dkt. 61)).

*see Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 492 (S.D.N.Y. 2003), and, in light of Plaintiff's *pro se* status, any supplemental allegations made by Plaintiff in opposition to Defendants' motions, *see Johnson v. Wright*, 234 F. Supp. 2d 352, 356 (S.D.N.Y. 2002) (deeming factual allegations contained in *pro se* plaintiff's brief to "supplement" his pleading). For purposes of Defendants' motions to dismiss, the Court must accept Plaintiff's factual allegations as true. (*See* Discussion *infra*, at Section I.)

### 1. Circumstances of Plaintiff's Arrest

After multiple outstanding warrants for Plaintiff's arrest were delegated to the USMS Violent Fugitive Task Force,[4] Plaintiff was arrested on January 13, 2011, by Masterson, Martin, and King.[5] (2d Am. Compl. § II, ¶ 2; *see also id*. Ex. A.) According to the USMS arrest report, Plaintiff was arrested without incident, handcuffed, and led to a parked vehicle. (*Id.* § II, ¶ 2; *see also id*. Ex. A.)

Plaintiff, however, alleges that, in the course of being escorted to the parked vehicle, his escort – who was either Martin or King (as Plaintiff contends that he was escorted by one of the special deputy marshals, but he is not sure which one) (*id*. § II, ¶ 5) – "roughly pulled up on [Plaintiff's] handcuffs without cause" (*id*. § II, ¶ 3). Plaintiff contends that he was then

---

[4] The following warrants were out for Plaintiff's arrest: the Bureau of Alcohol, Tobacco, Firearms, and Explosives obtained a warrant for Plaintiff's arrest for the possession of a firearm; the Bridgeport Police Department obtained a warrant for Failure to Appear in the First Degree, for an underlying charge of criminal possession of a firearm; and Connecticut State Probation obtained five warrants for Plaintiff's violation of probation, for underlying charges of larceny in the third degree and possession of narcotics. (2d Am. Compl., Ex. A.)

[5] Martin and King are Bridgeport, Connecticut police officers who were appointed as special deputy marshals on March 10, 2010 and December 2, 2010, respectively, to execute arrest warrants on behalf of the USMS. (Declaration of Shane Cargo, Esq., dated Mar. 4, 2015 (Dkt. 65).)

"violently pushed" into the side of the vehicle, and that his "right shoulder made direct contact, causing a severe fracture of [his] right shoulder/collarbone." (*Id.* § II, ¶ 4.)

According to Plaintiff, he "immediately informed" Masterson about the incident, and Masterson told Plaintiff that his "concerns were noted" and would be addressed once Plaintiff arrived at Wyatt, in Central Falls, Rhode Island. (*Id.* § II, ¶ 6.) Apparently Masterson then proceeded to drop off Martin and King at the Bridgeport, Connecticut police department, after which he took Plaintiff to the United States District Courthouse in Bridgeport, where Plaintiff went through the booking process. (*Id.* § II, ¶ 8.) Plaintiff alleges that, during booking, he complained to Masterson once more that he was in severe pain and discomfort, and showed Masterson his injured shoulder and collarbone. (*Id.* § II, ¶¶ 7-8.) Plaintiff contends that Masterson again told him that his concerns would be addressed at Wyatt. (*Id.*)

## 2. Plaintiff's Care at Wyatt

Plaintiff alleges that, when he arrived at Wyatt, he was examined during the intake process, and, at that time, the "pain and an obvious deformity of the collarbone [were] noted, as well as a limited range of motion." (*Id.* § II, ¶ 9.) Plaintiff further contends that he reported that he had been "roughed up by the officers," and that this report was documented in the January 13, 2011 "intake [h]ealth screening . . . and intake progress notes" taken at Wyatt. (*Id.*; *see also id.*, Exs. B and C.) Plaintiff contends that, two days later, on January 15, 2011, he was sent to Memorial Hospital in Pawtucket, Rhode Island for an X-ray. (*Id.* § II, ¶ 10; s*ee also id.*, Ex. D, at 18-19.) There, Plaintiff was diagnosed with a "Type III Achromio-Clavicle separation, Destel Fracture," for which he was issued a sling, medicated with Ultram,[6] and referred for an

---

[6] Ultram is a medication used to help relieve moderate to moderately severe pain. *See* http://www.webmd.com/drugs/2/drug-11276/ultram-oral/details (last accessed Nov. 2, 2015).

orthopedic consultation.  (*Id.* § II, ¶ 10.)  Plaintiff alleges that he waited for the orthopedic consultation "for some time" before complaining to his federal attorney, who sent letters to the Wyatt administration in an effort to speed up Plaintiff's treatment.  (*Id.* § II, ¶ 11.)

On April 5, 2011, approximately four months after his X-ray, Plaintiff apparently still had not received an orthopedic consultation, and he contacted "Mental Health Staff" and sent written health service requests to defendant Blanchette, at Wyatt.  (*Id.* § II, ¶ 12.)  Plaintiff eventually met with Blanchette, who, according to Plaintiff, "was more concerned about asking about when [Plaintiff] was to be sentenced in his pending legal matter than providing timely care."  (*Id.* § II, ¶ 13.)  Plaintiff further alleges that "Dr. Blanchette needlessly questioned [P]laintiff about his ethnic background."  (*Id.*)

Approximately eight months after his X-ray, on August 18, 2011, Plaintiff first saw an orthopedic specialist.  (*Id.* § II, ¶ 14.)  According to Plaintiff, the orthopedic specialist advised Plaintiff that he should have received treatment months earlier, when the injury was sustained.  (*Id.*)  A Wyatt form reflects that the orthopedist indicated that surgery was needed, but was "currently not urgent."  (*Id.*, Ex. E.)  The form also indicates, though, that an MRI of Plaintiff's shoulder was being ordered, and that, depending on the results of the MRI (and specifically if that test showed nerve damage), Plaintiff "may need surgery sooner."  (*Id.*)  According to Plaintiff, the orthopedic specialist conducted multiple MRIs to assess the extent of nerve damage to Plaintiff's collarbone, and made a recommendation for Plaintiff to undergo both corrective surgery and physical therapy.  (*Id.* § II, ¶ 14.)  While at Wyatt, however, Plaintiff was not referred for the surgery (*see id.* § V, ¶ 9), and he now states that he also "never saw a physical therapist" (Plaintiff Shawn S. Lehal's Response to Central Falls Detention Facility Corporation S/H/A Donald W. Wyatt Detention Facility, Edward Blanchette M.D., Defendants['] Motion To

Disimss the Second Amended Complaint, dated July 25, 2015 ("Pl. Opp. (2d Mtn.)") (Dkt. 86), at 4).

On December 1, 2011, Plaintiff was sentenced in the United States District Court in Bridgeport, Connecticut. (*Id.* § II, ¶ 15.)  During sentencing, Plaintiff's attorney informed the Court of Plaintiff's complaints regarding his injury and the delay in his treatment.  (*Id.*)  Plaintiff alleges that the Honorable Janet Hall, U.S.D.J., advised Plaintiff that she would make a judicial recommendation to the Federal Bureau of Prisons ("BOP"), directing that Plaintiff "be assessed for his shoulder injury, and be provided treatment, including surgery, as soon as possible."  (*Id.; see also id.*, Ex. H.)  According to Plaintiff, he returned to Wyatt one day after he was sentenced and met with Blanchette, who stated that Judge Hall had called the administration at Wyatt and inquired about Plaintiff's lack of treatment; Blanchette then gave Plaintiff his medical records. (*Id.* § II, ¶ 16.)

### 3.    Plaintiff's Eventual Surgery

On or about December 15, 2011, Plaintiff was transferred from the custody of Wyatt to the custody of the BOP, at the Federal Correctional Institution Fairton in Fairton, New Jersey. (*Id.* § II, ¶ 17.)  Plaintiff alleges that, while in BOP custody, he underwent additional X-rays and received additional orthopedic consultations, and that the results of both were consistent with the prior recommendations for surgical repair.  (*Id.*)

Finally, on February 8, 2013, approximately two years after the initial injury, Plaintiff was operated on by Dr. Jennifer L. Vanderbeck, M.D.  (*Id.* § III, ¶ 1.)  Plaintiff asserts that he underwent a "Musculoskeletal Transplant graft of a Gracilis Tendon (Hamstring) from a cadaver donation," had a portion of his fractured bone removed, and had permanent surgical screws implanted into his shoulder and collarbone, leaving a four-inch scar.  (*Id.* § III, ¶ 2.)  According

to Plaintiff, Dr. Vanderbeck informed him that, had he received treatment closer to the date of the injury, his bone may have mended and may not have required as extensive a repair as was ultimately necessary. (*Id.* § II, ¶ 19; § III, ¶ 2.)

### B. Procedural History

Plaintiff initiated this action on June 6, 2013, by filing a *pro se* Complaint against the USMS, Masterson, and John Does #1 and #2 from the Bridgeport, Connecticut police department for using excessive force while arresting him and for neglecting his medical needs. (Dkt. 2.) On October 30, 2013, Plaintiff filed an Amended Complaint, naming Martin and King in place of the John Doe defendants. (Dkt. 15.)

Thereafter, Plaintiff decided to add claims to his pleading regarding his care at Wyatt. On October 22, 2014,[7] Plaintiff filed a "Notice of Intent to Add Defendants to Complaint," stating, in relevant part, that he was filing the Notice "in order to preserve the statutes of limitation," and that he intended to add Wyatt to his complaint "for the 8th Amendment violations due to deliberately indifferent delayed treatment of a fractured Clavicle." (Dkt. 52.) With respect to his intended claims against Wyatt, Plaintiff added that he "left [Wyatt's] care and custody less than 3 years ago December 2011 and is within the statute of limitations." (*Id.*) On December 2, 2014,[8] Plaintiff filed his Second Amended Complaint, naming CFDFC[9] and Blanchette as additional defendants. (Dkt. 61.)

---

[7] *See* Discussion, *infra*, at Section III(A)(2), regarding the prison mailbox rule.

[8] *See* Discussion, *infra*, at Section III(A)(2).

[9] Plaintiff's Second Amended Complaint actually lists, as a defendant, "Donald W. Wyatt Detention Facility, Central Falls Detention Facility Corp." (2d Am. Compl.) For the reasons discussed below (*see infra*, at Section III and n.16), it appears that Plaintiff's claims would be properly asserted against CFDFC, rather than Wyatt, and the Court therefore will construe his pleading that way.

The Second Amended Complaint asserts Fourth Amendment excessive-force claims against Martin and King; Fifth or 14th Amendment deliberate-indifference claims against Masterson, Martin, King, Blanchette and CFDFC;[10] 14th Amendment equal-protection claims, as well as conspiracy claims under 42 U.S.C. §§ 1985 and 1986, against Blanchette and Wyatt; and an FTCA claim against the United States. (*Id.*)

Defendants Masterson, Martin, King, and the United States filed a partial motion to dismiss on March 4, 2015. (Dkt. 62.) In their moving brief, these defendants argue that Plaintiff's excessive-force claim against Masterson should be dismissed because, as Plaintiff concedes, Masterson was not the officer who pushed him into the side of the vehicle; that Plaintiff's deliberate-indifference claims should be dismissed as against all of the arresting officers because, even taking Plaintiff's allegations as true, these officers were neither personally involved in his medical care, nor "deliberately indifferent" to his medical needs; and that Plaintiff's FTCA claims should be dismissed for, *inter alia*, lack of exhaustion. (*See generally* Def. Mem. (1st Mtn.).) According to these defendants, the only claim against them that should survive their motion is Plaintiff's excessive-force claim against the officer (whether Martin or King) who actually used force against Plaintiff. Plaintiff filed an opposition to the motion on March 19, 2015 (*see* Plaintiff's Response to Defendant Pretrial Motion To Dismiss, dated Mar. 12, 2015 ("Pl. Opp. (1st Mtn.)") (Dkt. 69)), and the moving defendants filed a reply on

---

[10] Although Plaintiff has identified the Eighth Amendment as the source of his constitutional right to be free from deliberate indifference to his serious medical needs (*see* 2d Am. Compl. § V, ¶¶ 2, 9, 11), it is this Court's understanding that, at all times relevant to this action, Plaintiff was a pre-trial detainee, as opposed to a convicted inmate, and thus, as discussed below (*see infra*, at Section II(A)(2)), his deliberate-indifference claims should be liberally construed to arise under the Due Process Clause of the Fifth or 14th Amendment.

March 27, 2015.  (*see* Reply Memorandum of Law in Further Support of Defendants' Partial Motion To Dismiss, dated Mar. 27, 2015 ("Def. Reply (1st Mtn.)") (Dkt. 70).)

On June 30, 2015, defendants Blanchette and CFDFC filed a motion to dismiss all claims against them.  (Dkt. 80.)  In their motion, these defendants argue, *inter alia*, that Plaintiff's Section 1983 claims against them are barred by the applicable statute of limitations or are otherwise inadequate, and that Plaintiff has not pleaded any facts sufficient to support an equal-protection or conspiracy claim against them.  (*See generally* Memorandum of Law in Support of Motion To Dismiss the Second Amended Complaint by Defendants Central Falls Detention Facility Corporation s/h/a Donald W. Wyatt Detention Facility and Edward Blanchette M.D., dated June 30, 2015 ("Def. Mem. (2d Mtn.)") (Dkt. 82).)  Plaintiff filed opposition papers on July 30, 2015 (*see* Pl. Opp. (2d Mtn.)), and defendants Blanchette and CFDFC filed a reply on September 14, 2015 (*see* Reply Memorandum of Law in Further Support of Motion To Dismiss the Second Amended Complaint by Defendants Central Falls Detention Facility Corporation s/h/a Donald W. Wyatt Detention Facility and Edward Blanchette M.D., dated Sept. 14, 2015 ("Def. Reply (2d Mtn.)") (Dkt. 90)).

## DISCUSSION

### I. RULE 12 LEGAL STANDARDS

An action should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure where it is apparent that the court lacks subject matter jurisdiction to hear the case. *See* Fed. R. Civ. P. 12(b)(1).  Where, for example, exhaustion of a claim is a jurisdictional requirement, and lack of exhaustion is apparent from the face of a plaintiff's complaint, dismissal of the claim would be warranted under Rule 12(b)(1).  *See, e.g., Thomas v. Metro. Correction Ctr.*, No. 09cv1769 (PGG), 2010 WL 2507041, at *1 (S.D.N.Y. June 21, 2010) ("A claim is

properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." (citation omitted)). In contrast, Rule 12(b)(6) may be invoked to dismiss a claim that is insufficiently pleaded. Under this Rule, a defendant may move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

On a motion to dismiss, whether pursuant to Rule 12(b)(1) or Rule 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 190 (2d Cir. 2007); *accord Jaghory v. New York State Dep't of Ed.*, 131 F.3d 326, 329 (2d Cir. 1997). Further, "[i]t is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (collecting authority); *see also Hughes v. Rowe*, 449 U.S. 5, 10 (1980) (a *pro se* party's pleadings must be liberally construed in his favor and are held to a less stringent standard than the pleadings drafted by lawyers). This is especially true in the context of civil rights complaints. *See Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001).

The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991) (citation omitted). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 666), *cert. denied*, 131 S. Ct. 901 (2011).

On a motion to dismiss a complaint, a court is generally constrained to look only to the pleadings.  *See* Fed. R. Civ. P. 12(b); *Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 492 (S.D.N.Y. 2003).  Nonetheless, the mandate that a *pro se* plaintiff's complaint be construed liberally makes it appropriate for the court to consider the factual allegations in the plaintiff's opposition materials to supplement the allegations in the complaint.  *See Johnson*, 234 F. Supp. 2d at 356. In limited circumstances, a court may also consider certain additional materials, including documents attached to the complaint as exhibits or incorporated therein by reference, matters of which judicial notice may be taken, and documents that are "integral" to the complaint.  *Calcutti*, 273 F. Supp. 2d at 498 (citing *Brass v. American Films Technologies*, 987 F.2d 142, 150 (2d Cir. 1993); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

## II. PARTIAL MOTION TO DISMISS BY MASTERSON, <u>MARTIN, KING, AND THE UNITED STATES</u>

### A. *<u>Bivens</u>* <u>Claims</u>

There is no question that Plaintiff's claims against Masterson, as a federal Deputy Marshal, arise under *Bivens*, in which the Supreme Court recognized a private cause of action against federal officials, in their individual capacities, for unconstitutional conduct.[11]  *See*

---

[11] Plaintiff purports to bring his claims against Masterson pursuant to 28 U.S.C. § 1331. (2d Am. Compl. § V, ¶ 5.)  As that statute merely grants this Court jurisdiction over claims invoking federal questions, this Court understands Plaintiff to mean that his claims against Masterson should be construed to have been raised under federal law – *i.e.*, under *Bivens.*

*generally Bivens,* 403 U.S. 388. Plaintiff asserts, though, that his claims against Martin and King arise under 42 U.S.C. § 1983, as, according to the "Special Deputation Appointment" forms that governed their appointment as "Special Deputy Marshals," these officers were – and at all times remained – state employees. (*See* 2d Am. Compl. § V, ¶ 7 (quoting these forms as stating, "The appointee . . . is neither entering into an employment agreement with the Federal Government or any element thereof, nor being appointed to any position in the Federal Service by virtue of this special deputation."); *see also* Dkt. 65-1 (appointment forms).) Regardless of their formal employment status, however, these two defendants, by virtue of having been deputized by the USMS, were acting *under color of federal law* when they arrested Plaintiff, and this Court will therefore construe Plaintiff's claims against these defendants as having been asserted under *Bivens,* as well. *See Tavarez v. Reno,* 54 F.3d 109, 109-10 (2d Cir. 1995) (construing action brought by *pro se* plaintiff against federal officials under § 1983 as a *Bivens* action).

To be liable under *Bivens,* a defendant must: (1) have been personally involved in the violation of the plaintiff's rights; (2) have created or acquiesced in a policy or practice of poor training or supervision; or (3) have otherwise acted recklessly in managing his or her subordinates. *See, e.g., Barbera v. Smith*, 836 F.2d 96, 99 (2d Cir. 1987); *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1999). Thus, to plead a *Bivens* claim, a plaintiff must allege facts sufficient to show, *inter alia,* that the defendant denied the plaintiff a right secured by the Constitution. *See Smith v. Menafee*, No. 00cv2521 (DC), 2002 WL 461514, at *4 (S.D.N.Y. 2002); *Lee v. Carlson*, 645 F. Supp. 1430, 1436 (S.D.N.Y. 1986), *aff'd*, 812 F.2d 712 (2d Cir. 1987). Conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient, *see Barbera*, 836 F.2d at 99, and supervisors cannot

be held liable based solely on the alleged misconduct of their subordinates, *see Ellis v. Blum*, 643 F.2d 68, 85 (2d Cir. 1981) (citations omitted).

The arguments raised by the three arresting officers, in support of their motion to dismiss most of Plaintiff's claims against them, are addressed in turn.

### 1. Excessive-Force Claim Against Masterson

The Fourth Amendment, which guarantees U.S. citizens the "right to be secure in their persons . . . against unreasonable searches and seizures," protects citizens from the "unreasonable" use of force during the course of an arrest. *Graham v. Conner*, 490 U.S. 386, 395-96 (1989) (citing U.S. Const. amend. IV). "Determining whether the force used during an arrest is 'reasonable' requires balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Sash v. United States*, 674 F. Supp. 2d 531, 538 (S.D.N.Y. 2009) (adopting report and recommendation) (internal quotations and citations omitted).

The Supreme Court has held that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (internal quotations and citations omitted). Rather, in determining whether force was excessive, a court must evaluate the "'reasonableness of the force used by considering the totality of the circumstances faced by the officer on the scene.'" *Sash*, 674 F. Supp. 2d at 538 (quoting *Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995)); *see also Carpenter v. City of New York,* 984 F. Supp. 2d 255, 267 (S.D.N.Y. 2013) ("Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is 'objectively unreasonable in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or

motivation.'" (quoting *Papineau v. Parmley,* 465 F.3d 46, 61 (2d Cir. 2006)).)[12] Factors that courts may consider in determining whether the force used in a given arrest was reasonable include: "(1) the severity of the crime at issue, (2) whether the arrestee pose[d] an immediate threat to the safety of the officers or others, and (3) whether the arrestee [was] actively resisting arrest or attempting to flee." *Gersbacher v. City of New York*, No. 14cv7600 (GHW), 2015 WL 5692178, at *8 (S.D.N.Y. Sept. 25, 2015).

In order to prevail on an excessive-force claim under *Bivens,* a plaintiff must also be able to "show the defendant's personal involvement in the constitutional violation." *Sash*, 674 F. Supp. 2d at 542; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* . . . suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Thomas v. Ashcroft,* 470 F.3d 491, 496 (2d Cir. 2006) ("[I]n *Bivens* actions, a plaintiff must allege that the individual defendant was personally involved in the constitutional violation."). To plead that a defendant law enforcement official was personally involved in the excessive use of force against a plaintiff, the plaintiff may allege either that the defendant official was directly involved in the excessive use of force itself, or that the defendant official failed to intervene to protect the plaintiff's constitutional rights.

_____

[12] "This standard differs from the subjective standard applied to claims of excessive force used against prisoners in violation of the Eighth Amendment." *Gutierrez v. City of New York*, No. 13cv3502 (JGK), 2015 WL 5559498, at *7 n.2 (S.D.N.Y. Sept. 21, 2015) (citing *Whitley v. Albers,* 475 U.S. 312, 320-21 (1986).) Recently, the Supreme Court clarified that, to prove a Section 1983 excessive-force claim, a pretrial detainee is required to demonstrate only that the officers' use of force was objectively unreasonable, and does not need to demonstrate that the officers were subjectively aware of the unreasonableness of their use of force. *Kingsley v. Hendrickson,* 135 S. Ct. 2466, 2472-73 (2015).)

Here, defendant Masterson seeks to dismiss the Fourth Amendment excessive-force claim against him, based on his asserted lack of personal involvement in the alleged constitutional violation. (Def. Mem. (1st Mtn.), at 9.) Indeed, Plaintiff has not alleged that Masterson, himself, acted with excessive force. (*See* 2d Am. Compl. § V (claiming only that Martin or King used force against him).) Rather, both in his pleading and in the course of conferences before this Court, Plaintiff has maintained that it was one of the two special deputy marshals – *i.e.*, either Martin or King – and *not* Masterson, who pushed him into the side of a vehicle, causing his injury. (*Id*. § V, ¶ 5; *see also* Transcript of Proceedings Regarding Conference Held on Nov. 4, 2014 (Dkt. 55) at 5-6 (Plaintiff stating, during Court conference, that "Defendant Masterson, he was not the one that used any kind of excessive force, so I admitted that in my motion . . .," and that Masterson "wasn't the individual who used excessive force, so, like I said, I'm not going to pursue that on him because that wouldn't be right. He wasn't the individual that did that").

Liberally construed, though, Plaintiff's allegations could be read to plead that Masterson should be held liable for his fellow officer's use of excessive force because Masterson failed to intervene in that use of force. "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Thus, even where an officer is not, himself, directly charged with an excessive use of force,

> [a]n officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official.

*Id.* (internal quotations and citations omitted). Here, Plaintiff pleads that all three of the deputy marshals were present during his arrest. (2d Am. Compl. § II, ¶¶ 1-4.) Beyond that, in his opposition papers, Plaintiff alleges that Masterson "condoned the excessive force" used by another officer (Pl. Opp. (1st Mtn.), at 4), and argues specifically that Masterson "'can be held liable for his failure to interven[e] to protect the arrestee from his subordinate['s] excessive use of force'" (*id.*, at 3 (quoting *United States v. Pagan-Ferrer*, 736 F.3d 573 (1st Cir. 2013)).[13]

In order for an officer to be liable on an excessive-force claim based on a failure to intervene, the officer must have had a "realistic opportunity to intervene to prevent the harm from occurring." *Anderson*, 17 F.3d at 557. "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.* Courts may look to the length of the incident, *inter alia*, to determine whether an officer had a realistic opportunity to intervene. *See Sash*, 674 F. Supp. 2d at 545 (holding that where, according to plaintiff's own evidence, an incident took less than 30 seconds, no reasonable jury could conclude that defendant had an opportunity to intercede); *see also O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988) (finding police officer not liable for failure to intervene where another officer punched prisoner multiple times in rapid succession, because it "was not an episode of sufficient duration to support a conclusion that [he] . . . became

<hr/>

[13] Plaintiff also argues, in his opposition papers, that "[t]he Fourth Amendment violation should not be dismissed against Masterson for his deficient supervising of subordinates who committed wrongful acts, of excessive use of force" (*id.*, at 4), but, as noted above, Plaintiff cannot prevail on his excessive-force claim based on a theory of supervisory liability, *see Ellis*, 643 F.2d at 85. Plaintiff further asserts that Masterson "chose not to do his duty, because he did not want to document any suspicious (excessive force) incidents exhibited by a fellow officer" (Pl. Opp. (1st Mtn.), at 3), but this allegation does not speak to Masterson's potential culpability for the act of force itself.

a tacit collaborator"); *Johnson v. City of N.Y.*, 05cv7519, 2008 WL 4450270 at *6 (S.D.N.Y. Sept. 29, 2008) (granting summary judgment for police officers on failure to intervene claim where the alleged force lasted only a couple of seconds); *Jean–Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 327 (S.D.N.Y. 2006) (dismissing claims against police officers where another officer slammed plaintiff's head into a wall, finding that the dismissed defendants "did not have a reasonable opportunity to intervene in such a rapid series of events").

In this case, Plaintiff's *pro se* pleading and other filings do not lay out the details of the timeline of events, which, he claims, caused his injury. Plaintiff alleges that the special deputy marshal escorting him "roughly pulled up on [Plaintiff's] handcuffs without cause" and, some unspecified amount of time later, pushed Plaintiff into the side of the vehicle. (2d Am. Compl. § II, ¶¶ 3-4.) From Plaintiff's description, it is unclear how much time passed during the incident, where the other marshals were located in relation to the special deputy marshal who allegedly pushed Plaintiff into the vehicle, and whether there was a realistic opportunity for Masterson to intervene. Ultimately, an evidentiary record may well reveal that the use of force described by Plaintiff happened so quickly that Masterson would have had no realistic opportunity to intervene and prevent it, but, absent such a record, dismissal would be premature. Liberally construing Plaintiff's pleading, and giving Plaintiff the benefit of all favorable inferences, this Court finds it plausible that Masterson could have failed to intervene in an excessive use of force. Accordingly, to the extent Masterson seeks dismissal of Plaintiff's excessive-force claim against him under Rule 12(b)(6), the motion must be denied.

### 2.     Deliberate-Indifference Claims Against Arresting Officers

Plaintiff's deliberate-indifference claims against the arresting officers, however, cannot stand, as, even liberally construed, Plaintiff's pleaded allegations against these defendants are

insufficient to suggest that they committed this type of constitutional violation during the period when Plaintiff was in their custody.

Plaintiff purports to assert a deliberate-indifference claim against each of the three arresting officers under the Eighth Amendment, which prohibits "deliberate indifference to serious medical needs of prisoners," as this constitutes "'the unnecessary and wanton infliction of pain.'" *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "In the case of a person being held prior to trial," however, "'the cruel and unusual punishment proscription of the Eighth Amendment to the Constitution does not apply,' because 'as a pre-trial detainee [the plaintiff is] not being 'punished.'" *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009) (quoting *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir. 2000)). Nonetheless, the Due Process Clause of the Fifth Amendment operates to protect a citizen in federal custody, prior to conviction, from the same type of deliberate indifference to his serious medical needs. *See id.* ("[A] person detained prior to conviction receives protection against mistreatment . . . under the Due Process Clause of the Fifth Amendment if the pretrial detainee is held in federal custody, or the Due Process Clause of the Fourteenth Amendment if held in state custody."); *see also Morrow v. Cty. of Nassau*, No. 15cv4793 (SJF) (AKT), 2015 WL 6691672, at *3 (E.D.N.Y. Nov. 3, 2015) (same) (adopting report and recommendation); *cf. Mills v. Fenger*, 216 F. App'x 7, 10 (2d Cir. 2006) (noting that a claim that state officers had unconstitutionally denied a plaintiff medical care should be evaluated under the Due Process Clause of the 14th Amendment).

Nonetheless, the same standards apply, regardless of whether a deliberate-indifference claim is brought under the Eighth Amendment or, for a federal detainee, the Fifth Amendment. *Morrow*, 2015 WL 6691672, at *3; *see Cuoco* 222 F.3d at 106 (noting that there was "no reason" why the Fifth Amendment analysis, for a pre-trial detainee in federal custody, should be different

that it would be under the Eighth Amendment, for a convicted inmate); *Adekoya v. Holder*, 751 F. Supp. 2d 688, 695 (S.D.N.Y. 2010) ("The tests for deliberate indifference under the Eighth and Fifth Amendments are the same."); *cf. Caiozzo*, 581 F.3d at 70 (noting that, for a pre-trial detainee in state custody, "the standard for deliberate indifference is the same under the Due Process Clause of the Fourteenth Amendment as it is under the Eighth Amendment").

Ultimately, to establish that an official was deliberately indifferent to his or her serious medical needs, a plaintiff must show both "(1) that the deprivation alleged [was] 'objectively sufficiently serious' such that the plaintiff was denied 'the minimal civilized measure of life's necessities,' and (2) that the defendant official possessed a 'sufficiently culpable state of mind' associated with the 'unnecessary and wanton infliction of pain.'" *Trammel v. Keane*, 338 F.3d 155, 161 (2d Cir. 2003) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). This standard "must be applied in a way that accounts for the precise circumstances of the alleged misconduct and the competing institutional concerns." *Id.* at 163.

The first prong of this inquiry, or the "objective test," requires the "court to examine how the offending conduct [was] inadequate and what harm, if any, the inadequacy has caused or will likely cause the [detainee]." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citation omitted). Where a plaintiff alleges a failure to provide medical treatment, "courts examine whether the [detainee's] medical condition [was] sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 785-86). In order to be considered "sufficiently serious," the plaintiff generally must establish that he or she suffered from "a condition of urgency," *i.e.*, one that could have produced death or degeneration, or that "extreme pain" existed. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks omitted; citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)); *see Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (a

serious medical condition exists where "the failure to treat [the detainee's] condition could result in further significant injury or the unnecessary and wanton infliction of pain"). Although "there is no settled, precise metric to guide a court in its estimation of the seriousness of a [detainee's] medical condition," courts, in evaluating whether a plaintiff has satisfied the objective prong of the deliberate-indifference test, have considered factors such as "(1) whether a reasonable doctor or patient would [have] perceived the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affect[ed] daily activities, and (3) 'the existence of chronic and substantial pain.'" *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (quoting *Chance*, 143 F.3d at 702 (2d Cir. 1998)).

The second prong, or the "subjective test," requires a showing that the defendant "[knew] of and disregard[ed] an excessive risk to [the detainee's] health or safety." *Farmer*, 511 U.S. at 837. A defendant's knowledge of an excessive risk can be established through a showing that "the risk was obvious or otherwise must have been known to a defendant." *Brock*, 315 F.3d at 164. With respect to disregard, a plaintiff must establish that the defendant acted with, at minimum, a reckless state of mind. *Farmer*, 511 U.S. at 839-40 ("Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law"); *Chance*, 143 F.3d at 703 ("negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim" (citing *Estelle*, 429 U.S. at 105-06)). "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703 (a "mere disagreement over the proper treatment does not give rise to a claim"); *see Walker v. Fischer*, 523 F. App'x 43, 44 (2d Cir. 2013) (citing *Chance*).

While Plaintiff's deliberate-indifference claims may be primarily directed toward CFDFC or Blanchette, who was the doctor who was allegedly charged with his care once he was detained at Wyatt, Plaintiff also asserts deliberate-indifference claims against the arresting officers, on the ground that they were aware of the seriousness of his injury and failed to take adequate steps to address it. Most specifically, Plaintiff asserts that Masterson did not report the alleged injury and "failed to call an ambulance after he was shown the visible broken bone." (Pl. Opp. (1st Mtn.), at 1.) According to Plaintiff, Masterson failed to acknowledge "what was clearly a medical emergency" and "'failed to take reasonable measures to abate the risk of more serious harm resulting from the injury.'" (*Id.* (quoting *Farmer*, 511 U.S. at 837, 847).)

Masterson, Martin, and King argue that Plaintiff's deliberate-indifference claims against them should be dismissed for failure to state a claim because Plaintiff has failed to allege that any of them were personally involved in, or supervised, his medical treatment. (Def. Mem. (1st Mtn.), at 12.) These defendants point out that they were not administrators of the facility where Plaintiff was detained, and argue that, even if they had been administrators there, they could not have been "personally involved" in Plaintiff's care, so long as they "relied upon or were guided by the opinions of medical personnel" without obstructing Plaintiff's care. (*Id.* (quoting *Joyner v. Greiner*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002).) Moreover, these defendants argue that the Second Amended Complaint fails to plead facts that, even taken as true, could plausibly satisfy the requisite two prongs of the deliberate-indifference test: that (1) there was a substantial risk of serious harm to Plaintiff, and (2) that any of these defendants had a culpable state of mind. (*Id.*, at 13.) As this Court agrees that Plaintiff has not alleged facts sufficient to meet the second prong of the applicable standard – *i.e.*, that any of the three arresting officers possessed a "sufficiently culpable state of mind" associated with the "unnecessary and wanton

infliction of pain," *Farmer*, 511 U.S. at 834 – this Court need not reach these defendants' other arguments.

To meet the requirements of the "subjective state of mind" prong of the deliberate indifference test, a plaintiff must be able to plead – and ultimately to prove – that the defendant acted with at least criminal recklessness, meaning that the defendant deliberately disregarded an actually known risk. *Farmer*, 511 U.S. at 836-40. Here, Plaintiff does not allege that Masterson, Martin, or King acted with the requisite scienter. As to Masterson, Plaintiff alleges that, when he told Masterson of his injury, Masterson merely took note of Plaintiff's concerns and said that his complaints would be addressed at Wyatt, when he arrived there. (*See* 2d Am. Compl. § II, ¶¶ 6, 9.) Plaintiff further alleges, as noted above, that, even when he showed Masterson a "visible broken bone," Masterson failed to call an ambulance. (Pl. Opp. (1st Mtn.), at 1.) According to Plaintiff, this is enough to suggest that Masterson was "'aware of facts from which [an] inference could be drawn that a substantial risk of serious harm'" to Plaintiff existed (*id.* (quoting *Farmer*, 511 U.S. at 837, 847), and that he displayed a sufficiently culpable state of mind (*id.*).

Plaintiff, however, does not actually allege facts sufficient to support his assertion that Masterson "[knew] of and disregard[ed] an excessive risk to [Plaintiff's] health or safety." *Farmer*, 511 U.S. at 837. Although Plaintiff alleges that Masterson viewed his injury, Plaintiff also concedes, in his pleading, that Masterson transported him to Wyatt on the day of his arrest (*see* 2d Am. Compl. § II, ¶¶ 1, 9), and he does not allege that Masterson knew that he would receive delayed or inadequate treatment upon his arrival there. In fact, Plaintiff alleges that, after Masterson informed him that his injuries would be assessed at Wyatt, the injuries were, indeed, examined upon his intake at Wyatt. (*Id.* § II, ¶ 9.) On their face, Plaintiff's allegations are

insufficient to suggest that the possibility of an excessive risk to Plaintiff was "obvious or otherwise . . . known to [Masterson]." *Brock*, 315 F.3d at 164.

Moreover, even taking Plaintiff's allegations as true, and assuming that Plaintiff's injury would ultimately have been less severe, had Masterson immediately called an ambulance, Masterson is "free from liability if [he] responded *reasonably* to the risk." *Farmer*, 511 U.S. at 844 (emphasis added). Plaintiff does not sufficiently allege that Masterson's taking him to Wyatt was an unreasonable response, or that Masterson acted with a reckless state of mind by taking him there, as opposed to calling for an ambulance. As Plaintiff's allegations regarding Masterson's conduct do not plausibly meet the subjective, state-of-mind prong of the deliberate-indifference standard, Masterson's motion to dismiss Plaintiff's deliberate-indifference claim against him must be granted.

As to Martin and King, Plaintiff does not allege that they had any involvement whatsoever with his medical care. Outside of asserting that one or the other of these defendants caused his injury, Plaintiff does not allege that either knew of or disregarded an excessive risk to his safety, following the injury. Thus, to the extent Martin and King have moved to dismiss Plaintiff's deliberate-indifference claims against them, their motion must be granted, as well.

### B.     FTCA Claim Against the United States

In addition to alleging constitutional claims against individual defendants, Plaintiff asserts a FTCA claim against the United States, for the alleged negligent denial of medical care by federal employees acting within the scope of their employment. (2d Am. Compl. § V, ¶ 15.) The United States argues that this claim should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction, or, alternatively, under certain exceptions to FTCA coverage.

### 1.    **FTCA Standards**

The FTCA provides that the "United States shall be liable [for tort claims] in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674(a).  The FTCA allows a waiver of the federal government's sovereign immunity in certain instances, but requires that suit be brought against the United States itself, not against individual defendants or agencies.  *See* 28 U.S.C. § 2679(a) & (b); *see also Mignogna v. Sair Aviation, Inc.*, 937 F.2d 37, 40 (2d Cir. 1991) ("[A]n action [under the FTCA] must be brought against the United States rather than an agency thereof."); *Williams v. M.C.C. Institution*, No. 97cv5352 (LAP), 1999 WL 179604, at *3 (S.D.N.Y. Mar. 31, 1999).  Government employees are immune from common-law tort suits when acting in the course of their employment.  *See Rivera v. United States*, 928 F.2d 592, 608-609 (2d Cir. 1991).

The FTCA, however, "requires the exhaustion of administrative remedies before an individual can bring suit in district court."  *Williams v. M.C.C. Inst.*, No. 97cv5332 (LAP), 1999 WL 179604 at *4 (S.D.N.Y. 1999).  Exhaustion under the FTCA, including presentation to and rejection by the appropriate federal agency, is required before a court may assert subject matter jurisdiction over an action.  *See* 28 U.S.C. §§ 2401(b) & 2675; *see also Williams* at *4.  A claim for damages under the FTCA must be (1) presented to the appropriate federal agency, and (2) either the claim must have been finally denied by the agency in writing, or the agency must have failed to make a final decision on the claim within six months of being filed.  28 U.S.C. § 2675(a).  In order to satisfy the first requirement, a claimant "must provide enough information to permit the agency to conduct an investigation and to estimate the claim's worth."  *Romulus v. United States*, 160 F.3d 131, 132 (2d Cir. 1998) (citing *Keene Corp. v. U.S.*, 700 F.2d 836, 841 (2d Cir. 1983)).

Moreover, exhaustion under the FTCA is jurisdictional. *Id.* (citing *Keene*, 700 F.2d at 842); *see also Czetwertynski v. U.S.*, 514 F. Supp. 2d 592, 595 (S.D.N.Y. 2007) (stating a failure to file an administrative claim against the proper federal agency deprives the Court of subject matter jurisdiction). "The burden is on [the] plaintiff to demonstrate subject matter jurisdiction in compliance with the FTCA's requirements." *Dowdy v. Hercules*, No. 07cv2488 (ENV) (LB), 2010 WL 169624 at *5 (E.D.N.Y. 2010) (citing *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 210, 214 (2d Cir. 1987)); *see also Adeleke v. United States*, 355 F.3d 144, 153 (2d Cir. 2004) (stating that this "procedural hurdle applies equally to litigants with counsel and to those proceeding *pro se*").

## 2. Lack of Exhaustion of Plaintiff's FTCA Claim

In this instance, Plaintiff's own pleading makes it clear that Plaintiff cannot demonstrate the necessary exhaustion of his administrative remedies. Plaintiff's arrest was conducted by the USMS (2d Am. Compl. § II, ¶ 1), and, as noted by Plaintiff, Wyatt is privately owned and operated, under a contract with the USMS (*id.* § II, ¶ 6). Thus, in order to assert an FTCA claim against the United States, either for any negligent delay in medical treatment by the arresting officers, or for alleged deficiencies in Plaintiff's medical care while Plaintiff was at Wyatt, Plaintiff would have had to present his claim, first, to the USMS. In particular, Plaintiff would have had to submit an administrative claim to the USMS, on Standard Form 95 ("SF-95 Form"). (*See* Def. Mem. (1st Mtn.), at 7.) Instead, in the section of his pleading where he claims to have exhausted his administrative remedies by the submission of an SF-95 Form (2d Am. Compl. § IV, ¶ 1), Plaintiff refers to an exhibit to his pleading (2d Am. Compl., Ex. L) that is plainly insufficient to satisfy the exhaustion requirement. Specifically, the exhibit to which Plaintiff refers is an SF-95 Form that was obviously completed after Plaintiff's surgery was performed

(*see id.* (describing the surgery)), and, at that point, Plaintiff was no longer in USMS custody. Rather, according to the form, Plaintiff was then incarcerated at a federal correctional facility – F.C.I. Allenwood – and the form reflects that it was directed not to the USMS, but rather to the BOP. (*See id.*) Even apart from this, the form does not contain any specific allegations regarding a delay in treatment by the USMS (*see id.* (stating only that the surgery "would have been less extreme if timely").) Accordingly, it is apparent from Plaintiff's own allegations that he has not exhausted his remedies as to any tort allegedly committed by the United States with respect to any denial of medical care, either immediately subsequent to Plaintiff's arrest or during the time he was detained at Wyatt.

For these reasons, Plaintiff's FTCA claim against the United States is appropriately dismissed under Rule 21(b)(1), for lack of subject matter jurisdiction.[14]

## III.   MOTION TO DISMISS BY BLANCHETTE AND CFDFC

Blanchette and CFDFC move to dismiss all claims against them, including Plaintiff's deliberate-indifference claims, which, without explanation, they characterize as arising under Section 1983, as opposed to *Bivens*. Given that Plaintiff was a federal detainee, this important threshold question requires analysis.[15]

---

[14] Furthermore, because CFDFC, which operates Wyatt, is an independent contractor, any FTCA claim relating to Plaintiff's alleged delay in obtaining treatment at Wyatt would, in any event, be barred because the FTCA specifically "precludes suits against the United States for injuries caused by its independent contractors." *Roditis v. United States*, 122 F.3d 108, 111 (2d Cir. 1997); *see also* 28 U.S.C. § 2671 (defining an "employee of the Government" as an "officer[] or employee[] of any federal agency," and specifically excluding "any contractor with the United States" from the definition of "federal agency," thereby precluding employees of independent contractors from inclusion in 28 U.S.C. § 1346(b)(1), which provides a limited waiver of sovereign immunity for certain losses or injuries caused by "any employee of the Government.").

[15] The distinction between a *Bivens* and Section 1983 claim is particularly important with respect to Plaintiff's claims against CFDFC because "a private corporation operating a prison [or detention facility] is not subject to suit under *Bivens*." *Correctional Services Corp. v. Malesko*,

According to CFDFC, it is a "municipal detention facility corporation" that operates Wyatt pursuant to a contract with the federal government, and Blanchette is an independent contractor at CFDFC. (Def. Mem. (2d Mtn.) at 2.) As a general proposition, private corporations operating under contracts with the federal government, as well as the individual employees of such corporations, are deemed to be acting under the color of federal law. *See Bender v. Gen. Servs. Admin.*, 539 F. Supp. 2d 702, 708 (S.D.N.Y. 2008) (finding that defendants, a private corporation that had a contract with the Social Security Administration and the corporation's employee, were acting under color of federal law). In fact, *Bender* relied on a decision of the United States District Court for the District of Rhode Island that, in 2003, made this very point with respect to CFDFC. *See id.* at 709 (citing *Sarro*, 248 F. Supp. 2d at 54 (full citation *supra*, at n.15) (finding that federal detainees at Wyatt have been "arrested by federal law enforcement agents and charged with federal crimes," and "by law [are] in the custody of the United States Marshals" and that, therefore, CFDFC and its employees are acting under color of federal law, for purpose of *Bivens* claims)). Indeed, at least one court within this Circuit, also in reliance on *Sarro*, has specifically held that CFDFC and its employees are federal actors, *see Shaw v. Lopez*, No. 04cv787 (WWE), 2004 WL 1396698, at *2 (D. Conn. June 17, 2004) (where plaintiff had alleged both Section 1983 and *Bivens* claims against CFDFC and its employee,

---

534 U.S. 61 (2001). In contrast, Section 1983 "permits an individual whose constitutional rights are violated to recover damages from the 'person' responsible for the violation," *Sarro v. Cornell Corrections, Inc.*, 248 F. Supp. 2d 52, 63 (D.R.I. 2003) (citing 42 U.S.C. § 1983), and "[a] municipality or a private entity is a 'person' within the meaning of the statute and may be held liable if the violation can be attributed to its own policy or custom," *id.*; *see also Monell v. Dep't of Social Servs.*, 436 U.S. 658, 692-94 (1978) (establishing that, to prevail on a Section 1983 claim against a municipality, a plaintiff must establish that his injuries were caused by a municipal policy, custom, or practice).

court dismissed Section 1983 claims, finding that "no defendant is a state employee or entity acting under color of state law").[16]

Since *Sarro*, however, the District of Rhode Island has re-examined the unique history and unusual character of CFDFC, and has concluded that, despite the fact that, at first blush, CFDFC appears merely to be a federal contractor, the entity should actually be found to be acting under color of state, not federal law. *See Lacedra v. Donald W. Wyatt Detention Facility*, 334 F. Supp. 2d 114, 140-41 (D.R.I. 2004) (explaining the history of Wyatt and concluding that CFDFC and its employees are acting under color of state law as they "are able to trace their traditional public function of prison operations to . . . the City of Central Falls, and finally, to the State of Rhode Island"); *see also Mathew v. Central Falls Detention Facility Corp*., No. CA 09-253S, 2011 WL 6056713, at *8 (D.R.I. Sept. 30, 2011) (report and recommendation stating that "[t]he central holding of *Lacedra* has been followed in subsequent decisions of [the District of Rhode Island]," and collecting cases), *adopted by* 2011 WL 6097978 (Dec. 6, 2011), *aff'd,* 12-1094 (1st Cir. June 12, 2014).

Based on the detailed explanation provided by *Lacedra*, it is apparent that Wyatt is a "unique creature of state law" that came into being after the State of Rhode Island enacted a statue authorizing municipalities to create public corporations to own and operate detention facilities. *Lacedra*, 334 F. Supp. 2d at 121. For this reason, as the District of Rhode Island has

---

[16] In *Shaw*, the named defendants include the Warden of the Donald W. Wyatt Detention Facility in Central Falls, Rhode Island, and the Donald Wyatt Detention Center. *Shaw*, 2004 WL 1396698, at *1. Because, as pointed out by the *Shaw* Court, "Wyatt Detention Center . . . is only the name of a building [and] a *Bivens* action is not cognizable against a building," the Court construes the plaintiff's claim to be against Cornell Companies, Inc. ("Cornell"), a private corporation that operated the facility and employed all staff members. *Id*. at *5. CFDFC has contracted with Cornell, and for ease of reference, this Court will refer to both corporations, collectively, as CFDFC. *See Sarro*, 248 F. Supp. 2d at 54 (noting that CFDFC contracted with Cornell to operate Wyatt Detention Facility).

now clarified, "employees of a corporation operating Wyatt should be considered as acting under state law for purposes of § 1983." *Caldwell v. Donald W. Wyatt Det. Facility, et. al.*, No. 10-15ML, 2010 WL 2636101, at *2 (D.R.I. May 12, 2010). Accordingly, this Court will analyze Plaintiff's claims against CFDFC and Blanchette under Section 1983, rather than under *Bivens*.

### A.      Statute of Limitations

The first argument asserted by CFDFC and Blanchette in their motion is that Plaintiff's Section 1983 claims against them should be dismissed as barred by the applicable statute of limitations. The statute of limitations for Section 1983 claims is found in the "general or residual [state] statute [of limitations] for personal injury actions." *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)). In New York, that period is three years. *See* N.Y. C.P.L.R. § 214(5); *see also Keitt v. New York City*, 882 F. Supp. 2d 412, 423 (S.D.N.Y. 2011); *Paige v. Police Dept. of Schenectady*, 264 F.3d 197, 199 n.2 (2d Cir. 2001). Blanchette and CFDFC argue that Plaintiff's Section 1983 claims against them should be dismissed as time-barred because, they contend, those claims accrued no later than December 15, 2011 (when Plaintiff left the custody of Wyatt and was transferred to the custody of the BOP), and the Second Amended Complaint was not filed until more than three years after that date. (*See* Def. Mem. (2d Mtn.), at 1, 5.) In their statute-of-limitations analysis, however, Blanchette and CFDFC fail to take into account the so-called "prison mailbox rule," which – at least at the pleading stage – provides a basis for these claims to proceed.

### 1.      Accrual of Claim

"A Section 1983 claim ordinarily 'accrues when the plaintiff knows or has reason to know of the harm.'" *Shomo v. City of New York,* 579 F.3d 176, 181 (2d Cir. 2009) (quoting *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir. 1994)); *see also Singleton v. City of New York*,

632 F.2d 185, 191 (2d Cir. 1980); *Hogan v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013). Delay in

discovering the cause or extent of the injury does not prevent the claim from accruing. *See*

*Rosse v. United States*, No. 14cv00816 (MAD), 2015 WL 2453477, at *10 (N.D.N.Y. May 22,

2015) (accrual of the statute of limitations "does not await determination of the full extent of the

injury"); *Singleton*, 632 F.2d at 191 (accrual begins "when the plaintiff knows or has reason to

know of the injury which is the basis of his action").

There is, however, an exception to "the normal knew-or-should-have-known accrual

date" in cases of continuing violations. *JCG v. Ercole*, No. 11cv6844 (CM) (JLC), 2014 WL

1630815, at *9 (S.D.N.Y. Apr. 24, 2014) *report and recommendation adopted*, 2014 WL

2769120 (S.D.N.Y. June 18, 2014) (internal quotation marks and citations omitted); *see also*

*Gonzalez v. Wright*, 665 F. Supp. 2d 334, 350 (S.D.N.Y. 2009) (citing *Shomo,* 579 F.3d at

180-81) ("The continuing violation doctrine acts as an exception to the normal accrual date

calculation in section 1983 cases."). The "continuing violation doctrine" provides that "the

commencement of the statute of limitations period may be delayed until the last [wrongful] act in

furtherance of it." *Shomo,* 579 F.3d at 180-81.

In *Shomo,* the Second Circuit held that the continuing violation doctrine could apply in a

Section 1983 case where "a prisoner challenge[d] a series of acts that together comprise [a

constitutional] claim of deliberate indifference to serious medical needs." *Shomo,* 579 F.3d at

182. The court clarified, however, that because "the continuing violation doctrine can apply . . .

does not mean it must." *Id*. at 180. Indeed, "[t]o assert a continuing violation for statute of

limitations purposes, the plaintiff must 'allege both the existence of an ongoing policy of

[deliberate indifference] and some non-time-barred acts taken in the furtherance of that policy.'"

*JCG*, 2014 WL 1630815, at *9 (quoting *Shomo,* 579 F.3d at 180-81). In *Shomo*, the court found

that the plaintiff had properly alleged a policy of disregarding medical recommendations about the plaintiff's medical needs. *Shomo,* 579 F.3d at 179. Even so, the Court dismissed the plaintiff's Section 1983 claims against two doctors and a physician's assistant as time-barred, holding that the continuing violation doctrine did not apply because (1) although one of the physicians had purportedly made an affirmative decision, within the limitations period, to deny the plaintiff's request for a second opinion, that act could not be said to fall within the alleged policy of disregarding recommendations, and (2) there were no allegations of any wrongful conduct by the second physician or the physician's assistant during the limitations period. *Id.* at 183-84 (noting that the second physician's last contact with plaintiff was outside that period). Thus, "[t]he Second Circuit's decision . . . made clear that in order for the continuing violation doctrine to apply, [the] plaintiff needed to show that [the defendants] committed at least one wrongful act within the statutory time period." *Gonzalez*, 665 F. Supp. 2d at 350.

Despite the particular outcome of *Shomo*, district courts should be cautious about dismissing a claim as time-barred, especially where plaintiffs are proceeding *pro se*, where the doctrine could plausibly apply. Thus, even where a *pro se* plaintiff does not provide an exact date for the defendant's last wrongful act, the plaintiff's claim should not be dismissed as untimely where the complaint "alleges a continuing violation and does not clearly demonstrate that [the plaintiff's] claims are out of time." *JCG*, 2014 WL 1630815, at *11 (denying motion to dismiss on timeliness grounds where the complaint sufficiently alleged a continuing violation by asserting a "continuous series of events giv[ing] rise to a cumulative injury" for the duration of the plaintiff's time at a detention facility, "extending into the relevant statutory time period").

In this case, Plaintiff has alleged a continuing violation in the form of a continued failure by Blanchette and CFDFC to provide him with surgery (or, as Plaintiff also alleges in his

opposition papers) physical therapy, despite recommendations that he be afforded such care, and "repeated requests" that he receive treatment. (*See* 2d Am. Compl. § II, ¶¶ 11-16; § V, ¶¶ 9, 11; Pl. Opp. (2d Mtn.), at 2; *see also id*., at 4-5.) While Blanchette and CFDFC correctly argue that the accrual date of Plaintiff's deliberate-indifference claim could not be *later* than December 15, 2011 (the date Plaintiff left Wyatt),[17] they do not discuss whether Plaintiff's claim in fact accrued *earlier* than that. The fact that these defendants do not even raise the issue of an earlier accrual date, coupled with the fact that Plaintiff is acting *pro se* and has plausibly alleged a continuing violation, make it premature for this Court to engage in a fact-intensive inquiry as to whether a date earlier than December 15, 2011 should be used as the starting date for the statute-of-limitations analysis. Rather, for present purposes, the Court will accept December 15, 2011 as the date when Plaintiff's deliberate-indifference claim against Blanchette and CFDFC accrued, while noting that, if the discovery record does not bear out that Blanchette or anyone else at Wyatt engaged in a specific wrongful act within the limitations period, then the statute-of-limitations issue may have to be revisited.

### 2. Filing Date

Where a plaintiff "seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of

---

[17] Plaintiff's argument that his deliberate-indifference claim should not be found to have accrued until February 28, 2013, the date that his corrective surgery was finally performed (Pl. Opp. (2d Mtn.), at 2), does not have merit. Accrual of the statute of limitations "does not await determination of the full extent of the injury," *Rosse v. United States*, 14cv00816 (MAD), 2015 WL 2453477, at *10 (N.D.N.Y. May 22, 2015), and Plaintiff alleges that he was in pain and requesting treatment while he was at Wyatt, and that he was denied adequate treatment there despite his requests. Further, the continuing violation doctrine can only extend a defendant's violation, for statute-of-limitations purposes, through the last wrongful act of that named defendant, and any wrongful conduct which Plaintiff attributes to Blanchette or CFDFC could only have occurred while Plaintiff was in custody at Wyatt.

limitations purposes." *Bensinger v. Denbury Res., Inc*., 31 F. Supp. 3d 503, 509 (E.D.N.Y. 2014) (quoting *Rothman v. Gregor*, 220 F. 3d 81, 96 (2d Cir. 2000)).  Further, pursuant to the "prison mailbox rule," a *pro se* prisoner's complaint is deemed to be "filed" when it is delivered to prison officials for transmittal to the court.  *Houston v. Lack,* 487 U.S. 266, 270 (1988) (establishing that the prison mailbox rule applies to notices of appeal); *Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993) *opinion modified on reh'g*, 25 F.3d 81 (2d Cir. 1994) (extending the prison mailbox rule to complaints filed by *pro se* prisoners).

The purpose of the prison mailbox rule is to offset the "unique difficulties" that *pro se* prisoners encounter when attempting to file papers, as they "cannot personally ensure receipt of [their] legal documents by the court clerk . . . [or] even place [their] complaint[s] directly into the hands of the United States Postal Service."  *Dory*, 999 F.2d at 682 ("The prisoner simply has no control over the processing of his complaint, and he should not be required to do more under Fed. R. Civ. P. 5(e) than turn his complaint over to prison officials within the statute of limitations period.").  Thus, for statute-of-limitations purposes, courts look to the date a *pro se* prisoner gave his complaint to prison officials for filing, rather than the date the document was actually stamped as filed.  *Id*. (finding claim timely where plaintiff demonstrated that he delivered complaint to prison officials within three-year statute of limitations period, even though complaint was not docketed as "filed" until after the limitations period had run).  In the absence of other evidence as to when the prisoner actually delivered his complaint to prison officials, this Court looks to the date when the complaint was signed.  *See, e.g*., *Shaw v. Superintendent, Attica Corr. Facility*, No. 03cv0610 (NPM), 2007 WL 951459, at *3 (N.D.N.Y. Mar. 28, 2007).[18]

---

[18] Evidence eventually may, or may not, bear out that that a *pro se* prisoner's papers were actually delivered to prison officials for mailing on the date when the papers were signed.  *See,*

In this case, Plaintiff did not file a motion for leave to amend his existing pleading, so as to add Blanchette and CFDFC. As set out above, however, he did file a "Notice of Intent To Add Defendants to Complaint," identifying Wyatt as an intended defendant, and, under the prison mailbox rule, that filing must be deemed to have been made on October 22, 2014, the signature date reflected on the document. (*See* Dkt. 52 ("Notice of Intent").)[19] For statute-of-limitations purposes, this filing served the same purpose as a motion to amend, as it made clear Plaintiff's desire to amend his pleading to add Wyatt (or, as properly named, CFDFC) as a defendant. If December 15, 2011 is taken as the accrual date of Plaintiff's deliberate-indifference claim against CFDFC, and if October 22, 2014 is taken as the date the action was commenced against CFDFC for statute-of-limitations purposes, then Plaintiff's claim was timely filed within the three-year limitations period.

CFDFC argues, though, that the Notice of Intent cannot be considered the equivalent of a motion to amend, as it did not attach a copy of Plaintiff's proposed Second Amended Complaint. (*See* Def. Reply (2d Mtn.), at 1.) In particular, CFDFC relies on *Bensinger v. Denbury Res., Inc.*, 31 F. Supp. 3d 503, 509 (E.D.N.Y. 2014) in support of its assertion that, without an attached proposed amended complaint, a notice to amend is insufficient to provide the required notice. (Def. Reply (2d Mtn.), at 1.) In *Bensinger*, however, the court stated that "[i]f a pre-motion letter

---

*e.g.*, *Dory*, 999 F.2d at 681 (finding that *pro se* prisoner's argument regarding the date he delivered his complaint to prison officials was "substantiated by a copy of the Department of Correctional Services form demonstrating that he had submitted his legal papers to prison officials prior to the official filing of the complaint"); *Houston*, 487 U.S. at 270 (noting that "authorities keep detailed logs for recording the date and time at which they receive papers for mailing and can readily dispute a prisoner's contrary assertions").

[19] As noted above (*see supra*, at n.18), CFDFC may eventually be able to obtain evidence to challenge that this submission was actually delivered to prison officials for mailing on October 22, 2014, but no such evidence is presently before the Court.

requesting leave to move to file an amended complaint includes a proposed amended complaint *or otherwise puts the defendants on notice of the claims sought to be asserted*, it can serve to commence the action for statute of limitation purposes." *Bensinger*, 31 F. Supp. 3d at 509 (emphasis added) (citing *Teri v. Spinelli*, 980 F. Supp. 2d 366 (E.D.N.Y. 2013) for the proposition that "plaintiffs' letter-request for leave to amend the complaint commenced the action against the added defendant for statute of limitations purposes because the added defendant 'had notice of the claims against him before the statute of limitations period had run'"). Here, Plaintiff's Notice of Intent, in which Plaintiff expressly stated that he intended to add Wyatt to his complaint on a constitutional, deliberate-indifference claim (*see* Notice of Intent, at 1), was sufficient to give CFDFC notice of this claim. Accordingly, as the Court, at this time, accepts Plaintiff's last date at Wyatt as his claim accrual date, CFDFC's motion to dismiss Plaintiff's deliberate-indifference claim against it on statute-of-limitations grounds must be denied.

As for Plaintiff's deliberate-indifference claim against Blanchette, the Court notes that Plaintiff's Notice of Intent did not identify Blanchette as a proposed defendant. Rather, it was not until Plaintiff proceeded to file his Second Amended Complaint that he specifically named Blanchette as a defendant in this action. Contrary to Blanchette's argument, however, that filing cannot be considered to have been made on January 28, 2015, the date shown on the Docket. Rather, based on the prison mailbox rule and the information presently available to this Court, the Second Amended Complaint must be deemed to have been filed on December 2, 2014, the date when the pleading both reflects that it was signed, and when Plaintiff suggests that he delivered it to prison officials. (*See* 2d Am. Compl., at 10; Pl. Opp (2d Mtn.), at 1 (stating that "[t]he [Second Amended Complaint] is typed dated and signed '12/02/1014' . . . and was given

to F.C.I. Allenwood Prison officials for delivery to the postal service"); *see also id.* (citing *Shaw v. Superintendent, Attica Corr. Facility*, No. 3cv0610 (NPM), 2007 WL 951459, at *19 n.3 (N.D.N.Y. Mar. 28, 2007) for the proposition that "[t]he date that the complaint is signed is the date that [the] prisoner is presumed to have handed the complaint to a prison guard for mailing").)

Assuming, for purposes of this motion, that Plaintiff's deliberate-indifference claim against Blanchette accrued on December 15, 2011, and that Plaintiff filed that claim on December 2, 2014, the claim would have been made within the three-year limitations period for Section 1983 claims. Thus, at this point, the claim must be considered timely, and Blanchette's motion to dismiss the claim as time-barred must also be denied.[20]

**B. Adequacy of Plaintiff's Deliberate-Indifference Claim, as Pleaded Against Blanchette and CFDFC**

Blanchette and CFDFC also argue that, even if Plaintiff's deliberate-indifference claims against them were timely asserted, the claims should nonetheless be dismissed as insufficient. Although Plaintiff asserts that both of these defendants acted with deliberate indifference to his serious medical needs by providing inadequate care for his shoulder injury (2d Am. Compl. § V, ¶¶ 9, 11), Blanchette contends that Plaintiff's injury was "adequately assessed and treated after he arrived at Wyatt" (Def. Mem. (2d Mtn.), at 10), that any delay in his surgery was "reasonable"

---

[20] Given that, at this juncture, this Court must consider Plaintiff's deliberate-indifference claims against CFDFC and Blanchette to have been timely filed, the Court need not reach the parties' additional arguments as to whether the claims "relate back" to Plaintiff's earlier-filed claims against other defendants, or whether the limitations period was subject to equitable tolling. (*See* Def. Mem. (2d Mtn.), at 7-8; Pl. Opp. (2d Mtn.), at 3; Def. Reply (2d Mtn.), at 2-5.) Should evidence be developed that demonstrates that Plaintiff's deliberate-indifference claims against CFDFC and/or Blanchette were not, in fact, asserted within the limitations period – either because the accrual date was, in fact, earlier or the filing date was, in fact, later than those dates assumed herein – these additional doctrines may then become relevant.

(*id.*, at 11), and that Plaintiff has failed to allege that Blanchette "acted with culpable recklessness" (*id.*). CFDFC, for its part, argues that, in the absence of an underlying constitutional violation, and because Plaintiff has not pleaded the other elements of a *Monell* claim, *see Monell v. Dep't of Social Servs.*, 436 U.S. 658, 692-94 (1978) (holding that, to prevail on a Section 1983 claim against a municipality, a plaintiff must establish that his injuries were caused by a municipal policy, custom, or practice), Plaintiff's has also failed to plead a viable deliberate-indifference claim against it. (*See* Def. Mem. (2d Mtn.), at 13 (citing *Monell*, 436 U.S. at 692-94).) While CFDFC's position is persuasive, as Plaintiff has not plausibly alleged that his alleged failure in treatment was part of a policy, custom, or practice, Blanchette's arguments are unconvincing at this stage.

### 1. Claim Against Blanchette

In the prison context, deliberate indifference to serious medical needs can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed," *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976), and the same is true in the context of pretrial detention, *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (noting that the "same criteria" applies to both pre-trial detainees and inmates who allege deliberate indifference claims).[21] Here, taken as true, Plaintiff's allegations of Blanchette's continued

---

[21] Like the arresting officers, CFDFC and Blanchette have framed their argument as to the sufficiency of Plaintiff's deliberate indifference claims in Eighth Amendment terms. (Def. Mem. (2d Mtn.) at 8-10.) As discussed above, however (*see supra*, at Section II(A)(2)), the Eighth Amendment does not apply here, as Plaintiff was not a convicted inmate at Wyatt, but rather a pre-trial detainee. Thus, his rights would have arisen under the 14th Amendment, if, while at Wyatt, he is considered to have been in state custody, or under the Fifth Amendment, if he is considered to have been in federal custody. (*See id.*)

failure to provide him with adequate care for his injury, despite knowledge of its severity and the pain it was causing, could be sufficient to satisfy both the objective and subjective prongs of the deliberate-indifference standard.

First, where a plaintiff has alleged that he received unreasonable medical care because of a defendant's failure to provide treatment, the objective prong test requires the Court the examine whether the harm to Plaintiff was "sufficiently serious," meaning that the plaintiff suffered from "a condition of urgency," *i.e*., one that may produce death or degeneration, or that "extreme pain" exists. *Hill*, 657 F.3d at 122. As discussed in Section II(A)(2), *supra*, in determining whether the injury was sufficiently serious, the Court may specifically look to "(1) whether a reasonable doctor or patient would [have] perceive[d] the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affect[ed] daily activities, and (3) the existence of chronic and substantial pain." *Brock*, 315 F.3d at 162 (internal quotation marks and citations omitted).

In this instance, Plaintiff asserts that he sustained a "Type 3 Achromio-Clavicle Separation," which (according to publicly available sources) apparently occurs when the clavicle is completely separated from the shoulder blade. *See* http://www.webmd.com/pain-management/type-iii-shoulder-separation (last accessed Nov. 13, 2015). Further, "[a] type III shoulder separation occurs when both the acromioclavicular and coracoclavicular ligaments are completely torn." *Id.* It is certainly plausible that this alleged injury was reasonably "worthy of comment or treatment"; indeed, Plaintiff has alleged that the district court in Rhode Island, upon learning of Plaintiff's injury, itself contacted Wyatt to inquire about Plaintiff's medical treatment. (2d Am. Compl. § II, ¶ 14.) Further, Plaintiff has alleged that his daily activities were altered, such that his abilities to "shave, clean himself or maintain acts of basic hygiene, raise a

spoon with his right hand to eat, write, do artwork, pick up his own food tray in the mess hall, or sleep on his right side" were severely limited. (Pl. Opp. (2d Mtn.), at 6.) Plaintiff has further alleged that his injury caused him chronic and significant pain. (*See id*.) Thus, Plaintiff's allegations are sufficient to satisfy the objective prong of the deliberate-indifference standard.

Second, as to the subjective prong of the standard, which requires that an official "knows of and disregards an excessive risk to inmate health or safety," *Farmer*, 511 U.S. at 834, Plaintiff adequately alleges that Blanchette was aware of his injury and pain. In the Second Amended Complaint, Plaintiff alleges that, during his intake procedure on January 13, 2011, personnel at Wyatt noted that he was injured (2d Am. Compl. § II, ¶ 9), and that, two days after intake, he was sent to the hospital for an X-ray, where he was diagnosed with "Type 3 Achromio-Clavicle Separation," issued a sling, medicated with Ultram, and referred for an orthopedic consultation (*id*. § II, ¶ 10). Plaintiff also alleges that he "made many written health service requests" to Blanchette, specifically (*id*. § II, ¶ 12), but that Blanchette "was more concerned about asking about when the plaintiff was to be sentenced in his pending legal matter than providing timely care" (*id*. § II, ¶ 13).

Moreover, in his opposition papers, Plaintiff asserts that Blanchette "was completely informed of the plaintiff's injury," that it was Blanchette who "made the decision to wait 8 months . . . to send the plaintiff to an orthopedic specialist despite repeated complaints of pain and suffering," and that, upon finally receiving the specialist's report – which recommended "physical therapy for muscle and nerve symptoms," and indicated a "need[]" for surgery – Blanchette "totally ignored" the report's findings and recommendations. (Pl. Opp. (2d Mtn.), at 4.) According to Plaintiff, Blanchette "intentionally delayed [Plaintiff's] corrective surgery

and treatment until such a time when the plaintiff would be sentenced and sent to a [BOP] facility, thus becoming somebody else's problem to fix." (*Id*.)

Blanchette argues that, because Plaintiff admits that he was examined for his injury on more than one occasion during the time that he was at Wyatt, and was given treatment that included pain medication and a sling, his allegations amount to nothing more than a "mere disagreement over [his] proper treatment," thus rendering them insufficient to state a constitutional claim. (*See* Def. Mem. (2d Mtn.), at 10 (quoting *Thompson v. Racette*, 519 Fed. Appx. 32, 33 (2d Cir. June 4, 2013).) Blanchette also contends that any delay in surgery cannot be viewed as rising to the level of a constitutional deprivation of adequate care, because, "critically," the report from the orthopedist, which is attached to Plaintiff's pleading and incorporated therein by reference, indicated that, while surgery would be needed, it was not "urgent." (*Id*.; *see also* 2d Am. Compl., Ex. E.) The same report, however, also indicated that, if Plaintiff's MRI showed nerve injury, then surgery might be "need[ed] . . . sooner." (2d Am. Compl., Ex. E.) Plaintiff appears to contend that he *did* have nerve damage (*see* Pl. Opp. (2d Mtn., at 5), and thus, at best, Blanchette's arguments raise a factual dispute as to whether the alleged deprivation of care was reckless or reasonable. At this stage, this Court finds that Plaintiff has pleaded a plausible claim against Blanchette for deliberate indifference to Plaintiff's serious medical needs, and that Blanchette's motion to dismiss this claim under Rule 12(b)(b)(6) must be denied.

### 2.    Claim Against CFDFC

On the other hand, the motion to dismiss Plaintiff's deliberate-indifference claim against CFDFC must be granted. As explained in *Lacedra*, 334 F. Supp. 2d at 121, CFDFC is a public corporation, created by a municipality for the purpose of operating a state facility. As such,

CFDFC can only be liable on Section 1983 claims where such claims meet the standard set by *Monell* for municipal liability. At most, Plaintiff's Second Amended Complaint alleges that "Wyatt, and its employees, did not provide surgical repair in a year[']s time causing the plaintiff permanent disfigurement, and injury." (2d Am. Compl. § V, ¶ 11.) This mere statement that Plaintiff was not provided care at Wyatt for an extended period of time does not speak to whether FCDFC had a "policy" or a general "custom" or "practice" of not providing medical or surgical care to detainees.

In his opposition papers, Plaintiff tries to address the *Monell* argument raised by CFDFC, by asserting that Wyatt "is continually involved in dysfunction" and that it has demonstrated a "policy, custom, and practice of irresponsibility." (Pl. Opp. (2d Mtn.), at 8.) More specifically, Plaintiff alleges:

> In just the single year that the plaintiff was housed there, the Warden was arrested in a theft scheme, medical assistants were escorted off the premises for inappropriate relationships, as well as the town of Central Falls where Wyatt is located had to declare bankruptcy due to Wyatt defaulting on its agreed upon financial contracts with the town.

(*Id*.) These disparate problems, though, even if they occurred, would not constitute a policy or custom of depriving detainees of adequate medical treatment. Plaintiff makes only one allegation that any other Wyatt detainee was denied medical care, and that allegation mentions only one other individual, who, at some point in time (not identified by Plaintiff), while being held at Wyatt as an immigration detainee, allegedly died after receiving inadequate treatment for cancer. (*Id*.) This is insufficient to plead a municipal policy, practice or custom of deprivation of medical care.

The Court also notes that, while a failure to conduct adequate training of employees with respect to the protection of detainees' constitutional rights can be actionable under *Monell*, *see,*

*e.g.*, *City of Canton, Ohio v. Harris*, 489 U.S. 378, 380 (1989), Plaintiff's allegations regarding

CFDFC's purported failure to train Wyatt employees are too vague and conclusory to state a

claim. On this point, Plaintiff asserts:

> The plaintiff's federal attorney . . . and federal judge both made calls and sent letters of inquiry to administrators at Wyatt. [H]owever, nobody cared to investigate. Even knowing that '[a] pattern of similar constitutional violations by untrained employees' caused Wyatt . . . to lose its contract with immigration/'ICE,' and an immigration detainee to lose his life.

> They made no attempt to resolve the complaints of the attorney or judge, or speak with Dr. Blanchette about getting the plaintiff corrective surgery or physical therapy. This is a failure to train, manage subordinates, and a custom of disregard of consequence, which exposed the plaintiff to the indifference in his contact with Dr. Blanchette.

 (*See* Pl. Opp. (2d Mtn.), at 8-9.) Allegations that the administration at Wyatt failed to

investigate complaints about Plaintiff's lack of medical treatment are not, without more,

sufficient to plead a general failure to train, or an official policy or custom of failing to

investigate complaints of constitutional violations. *See, e.g., Triano v. Town of Harrison, NY*,

895 F. Supp. 2d 526, 539 (S.D.N.Y. 2012) (collecting cases and dismissing failure to train claim

where plaintiff did "no more than make conclusory assertions" that the defendant failed to

properly train its employees, without "providing any supporting factual detail about alleged

deficiencies in the training program"); *Johnson v. City of New York*, No. 06cv09426 (GBD),

2011 WL 666161, at *4 (S.D.N.Y. Feb. 15, 2011) (finding plaintiff's failure to train allegation

insufficient where plaintiff "[did] not ple[a]d any facts that plausibly allege a specific deficiency

in the training or supervision program that accounts for deprivation of [his] constitutional rights"

(internal quotation omitted)). Accordingly, the motion of CFDFC to dismiss the deliberate-

indifference claim against must be granted.

### C.    Adequacy of Plaintiff's Remaining Claims Against CFDFC and Blanchette

Plaintiff also states in his Second Amended Complaint that his constitutional right to equal protection, as well as his rights under 42 U.S.C. §§ 1985 and 1986, were violated by CFDFC and Blanchette.  (*See* 2d Am. Compl. § V, ¶¶ 1, 10, 12.)  To the extent Plaintiff is seeking to raise such claims, none can withstand scrutiny.

The Equal Protection Clause of the 14th Amendment provides that "no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike."  (*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985) (quoting U.S. Const. amend XIV).  To prevail on an equal-protection claim, a plaintiff "must demonstrate that the [defendant] intentionally discriminated against [him], either by adopting out of [discriminatory] animus policies which are facially neutral but have . . . a discriminatory effect, or by applying a facially neutral policy in a . . . discriminatory manner."  *Marchant v. New York City Bd. of Elections*, 815 F. Supp. 2d 568, 582 (S.D.N.Y. Aug. 16, 2013).  "To establish such intentional or purposeful discrimination, it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently."  *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994).

With reference to the 14th Amendment's equal-protection guarantee, Plaintiff alleges that he received inadequate care because of, *inter alia*, his "ethnicity."  (2d Am. Compl. § V, ¶¶ 10, 12; *see also id*. § II, ¶ 13 (alleging that Blanchette "needlessly questioned the plaintiff about his ethnic background").)  Plaintiff, however, does not allege that similarly situated persons of different ethnicity received better care, or that either CFDFC or Blanchette applied policies differently to Plaintiff based upon his ethnicity or race.  *See Marchant*, 815 F. Supp. 2d at 582.

Accordingly, Plaintiff's allegations are insufficient, on their face, to state an equal-protection claim.[22]

Any claims that Plaintiff may be trying to assert under Sections 1985 or 1986 are even more deficient. To plead a Section 1985 claim, a plaintiff must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws . . .; [and] (3) an act in furtherance of the conspiracy; (4) whereby the person is . . . deprived of any right of a citizen of the United States." *Biswas v. City of New York*, 973 F. Supp. 2d 504, 533 (S.D.N.Y. 2013). In his pleading, even as amplified by his opposition papers, Plaintiff does not allege *any* facts specific to any purported conspiracy claim. Further, a Section 1986 claim for neglect to prevent a conspiracy "must be predicated on a valid 1985 claim." *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 1991) (internal quotation marks and citation omitted). As Plaintiff has failed to allege any of the elements of a Section 1985 claim, he cannot be found to have pleaded a Section 1986 claim. The Court also notes that any Section 1986 claim relating to Plaintiff's treatment at Wyatt would plainly be time-barred, under

---

[22] Plaintiff's additional argument, that he "was discriminated against because of his status as an incarcerated pre-trial detainee" (P. Opp. (2d Mtn.), at 7; *see also id.* (stating that Blanchette "did not treat the plaintiff similarly as he would have treated a patient that was not incarcerated at an outside clinic" and that Blanchette "perceived the plaintiff in the class of a 'low life' or 'criminal,' a person unworthy of his best efforts")) cannot make out an equal-protection claim. Indeed, inmates or detainees are not considered a protected class for equal-protection purposes. *See Vargas v. Pataki*, 899 F. Supp. 96, 98-99 (N.D.N.Y. 1995) (dismissing equal protection claim and noting that "[p]risoners . . . considered in the aggregate . . . are not a suspect class" warranting the protections of a strict scrutiny standard of review) (internal quotation omitted)); *see also Dunham v. Conklin*, No. 13cv5409 (VB), 2014 WL 6646330, at *4 (S.D.N.Y. Oct. 30, 2014) (dismissing plaintiff's equal protection claim where plaintiff did not allege that he had been discriminated against on account of his race, sex, or some other protected characteristic).

the one-year statute of limitations applicable to such a claim.  *See Keitt v. New York City*, 882 F.

Supp. 2d 412, 423 (S.D.N.Y. 2011).

Therefore, to the extent CFDFC and Blanchette have moved to dismiss Plaintiff's equal-

protection claims, as well as any claims Plaintiff has asserted against them under 42 U.S.C.

§§ 1985 or 1986, the motion must be granted.

## IV.    <u>LEAVE TO AMEND</u>

A district court should generally not dismiss claims asserted by a *pro se* plaintiff without

granting the plaintiff leave to amend the complaint to cure the defects in the claims, as initially

pleaded.  Where an amendment would be futile, however, leave to amend is not required.  *See*

*Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin*, 861 F.2d at 42.

In this instance, it would be futile to grant Plaintiff leave to replead any claims that suffer

from defects that are not capable of being remedied.  Specifically, it would be futile for Plaintiff

to attempt to amend his FTCA claim and his Section 1986 claim, as the procedural barriers to

relief on those claims – the lack of exhaustion of the FTCA claim, and the one-year statute of

limitations that governs the Section 1986 claim – could not be overcome by an amendment.  *See*

*Ashmore v. Prus*, 510 F. App'x 47, 49 (2d Cir. 2013) (leave to amend is futile where barriers to

relief cannot be surmounted by reframing the complaint).

It would also be futile to allow Plaintiff to amend claims that, based on his own

allegations, cannot be substantively viable.  In this regard, given that Plaintiff concedes that he

was taken to Wyatt on the same day as his arrest and that he was seen there by medical

personnel, it would be futile to permit Plaintiff to amend his deliberate-indifference claims

against the arresting officers, as, in these circumstances, it is not plausible that the officers'

conduct could have risen to the level of a constitutional violation for the deprivation of medical

care. Indeed, Plaintiff, himself, now states that "if Dr. Blanchette would have arranged corrective surgery within 6 months, the plaintiff would have had another 6 months for physical therapy, benefitting the plaintiff's condition ultimately, sparing many of [his] deprivations." (Pl. Opp. (2d Mtn.), at 6.) This statement belies any argument that the arresting officers' delay in providing Plaintiff with medical attention for some number of hours resulted in a deprivation sufficient to constitute actionable harm under *Bivens*. Essentially, the flaw in the claim is a substantive one, which repleading cannot cure. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile."). The same is true for Plaintiff's equal-protection and Section 1985 claims, as his allegations offer absolutely no facts that are even slightly suggestive of actionable disparate treatment or a civil rights conspiracy.

It would not necessarily be futile, though, for Plaintiff to amend his *Monell* claim against CFDFC to attempt to plead that his alleged denial of necessary medical treatment was the result of an unconstitutional policy, custom, or practice at Wyatt. For example, while Plaintiff does not currently allege that CFDFC had a general policy to delay, for financial reasons, the medical treatment of detainees until their sentencing (and hence their transfer out of the facility), he at least suggests that this is what occurred in his case. (*See* Pl. Opp. (2d Mtn.), at 4-5 (stating that Blanchette "intentionally delayed . . . corrective surgery and treatment until such a time when the plaintiff would be sentenced and sent to a [BOP] facility," and that Blanchette's "decisions were cost based").) If Plaintiff were able to allege additional facts to support a claim that, as a general matter, CFDFC had a policy of delaying medical treatment for detainees so as to avoid costs, or that this was the facility's generally accepted practice, Plaintiff may be able to state a viable *Monell* claim. Plaintiff might also be able to state a *Monell* claim against CFDFC relating to a

failure to train medical staff or to investigate medical complaints, if he can add allegations that plausibly suggest deficiencies in these areas that go beyond his own, personal situation.

<u>CONCLUSION</u>

For the foregoing reasons, the partial motion to dismiss filed by defendants Masterson, Martin, King, and the United States (Dkt. 62) is granted to the extent that it seeks dismissal of Plaintiff's deliberate-indifference claims against each of the arresting officers and Plaintiff's FTCA claim against the United States, and is denied to the extent that it seeks dismissal of Plaintiff's excessive-force claim against Masterson.  The separate motion to dismiss filed by defendants CFDFC and Blanchette (Dkt. 80) is granted to the extent it seeks dismissal of Plaintiff's deliberate-indifference claim against CFDFC, as well as Plaintiff's equal-protection claim and claims for violations of 42 U.S.C. §§ 1985 and 1986, and is denied to the extent it seeks dismissal of Plaintiff's deliberate-indifference claim against Blanchette.

Leave to amend is denied, except as to Plaintiff's deliberate-indifference claim against CFDFC.  If Plaintiff believes that he would be able to replead that Section 1983 claim so as to satisfy the requirements of *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978), and if he wishes to do so, then he may file a Third Amended Complaint that includes such a repleaded claim, no later than February 5, 2016.  Plaintiff is cautioned that any Third Amended Complaint would entirely replace the Second Amended Complaint as Plaintiff's operative pleading in this case.  Thus, if Plaintiff files a third amended pleading, he should include in that pleading all of the claims that currently remain in this case (that is, his excessive force claims, under *Bivens*,

against the arresting officers, and his deliberate-indifference claim, under Section 1983, against

defendant Blanchette), together with his repleaded *Monell* claim against CFDFC.

The Clerk of Court is directed to close the motions listed on the Docket as Dkt. 62 and

Dkt. 80.

Dated: New York, New York
December 29, 2015

SO ORDERED

_____

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Mr. Shawn S. Lehal
20330-014
FCI Allenwood
P.O. Box 2000
White Deer, PA 17887

Defense counsel (via ECF)