WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
Attorneys for Central Falls Detention Facility
Corporation and Dr. Edward Blanchette, M.D.
1133 Westchester Avenue
White Plains, NY  10604
(914) 323-7000
Attn:  Lalit K. Loomba, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------  X

SHAWN S. LEHAL,                                              :   Docket No. 13-CV-3923 (DCF)

                                    Plaintiff,                       :

          -against-                                             :   **STATEMENT OF**
                                                                     **UNDISPUTED MATERIAL**
CENTRAL FALLS DETENTION FACILITY          :   **FACTS PURSUANT TO LOCAL**
CORPORATION, EDWARD BLANCHETTE, M.D.,        **RULE 56.1**
JAMES MASTERSON, ROBERT MARTIN and ERIC   :
KING,

                                                                     :

                                    Defendants.                :

-----------------------------------------------------------------------  X

Defendants Central Falls Detention Facility, Corp. a/k/a Wyatt Detention Facility

("CFDFC") and Dr. Edward Blanchette, M.D. ("Dr. Blanchette") (collectively, the "CFDFC

Defendants"), respectfully submit this statement of undisputed material facts pursuant to Rule

56.1 of the Local Rules of the Southern District of New York.  All exhibits referenced herein are

annexed to the accompanying declaration of Lalit K. Loomba, Esq.

Plaintiff's Arrest

1.       On January 13, 2011, plaintiff Shawn Lehal ("Lehal" or "plaintiff"), was arrested

inside a homeless shelter located at1868 Amsterdam Avenue, New York, New York, by Deputy

U.S. Marshals James Masterson, and Bridgeport Connecticut Police Officers Robert Martin and

Eric King, both of whom had been appointed as Special Deputy U.S. Marshals.  Third-Amended

6835233v.1

Complaint (**Exhibit A**), at ¶III(1); Deposition of Shawn Lehal taken January 31, 2017 ("Lehal

Dep.") (**Exhibit B**), at 22, 40-41; Deposition of James Masterson, taken July 26, 2016

("Masterson Dep.") (**Exhibit C**), at 39-48.

      2.      Plaintiff alleges that he injured his shoulder during the arrest, when one of the

Marshals "shoved the hell out of [him]," causing him to roll an ankle and fall, thereby hitting his

shoulder into the side of a vehicle. Ex. B (Lehal Dep.), at 48-49; *see also* Ex. A (Complaint), at

¶III(4).

      3.      Defendants Masterson, King and Martin each deny that they, or anyone else,

shoved or otherwise used unreasonable force against plaintiff, and they deny that plaintiff

suffered any injury during the arrest. Ex. C (Masterson Dep.), at 53; Deposition of Eric King,

taken July 25, 2016 ("King Dep") (**Exhibit D**), at 42-43; Deposition of Robert Martin taken July

25, 2016 ("Martin Dep.") (**Exhibit E**), at 35-36.

      4.      During the ride from the location of plaintiff's arrest to his arraignment at federal

court in Bridgeport, Connecticut, plaintiff stated that he had injured his shoulder while working

at a construction site. Ex. C (Masterson Dep.), at 55; Ex. D (King Dep.) at 43-44; Ex. E (Martin

Dep.), at 37.

      5.      During his arraignment before United States Magistrate Judge William I.

Garfinkel later that day, neither Lehal nor his attorney, Elliot Warren, Esq., of Torrington,

Connecticut, mentioned anything about Mr. Lehal having just suffered a major trauma to his

shoulder. **Exhibit F** (transcript of arraignment).

Plaintiff's Detention at the Wyatt Detention Facility

      6.      Following his arraignment before Magistrate Judge Garfinkel, plaintiff was

transported to the Wyatt Detention Facility in Central Falls, Rhode Island ("Wyatt"), which is

owned and operated by CFDFC.  *See* Exhibit A (Complaint), at ¶III(6).

      7.      Wyatt is a municipal detention facility corporation which, pursuant to contract with the federal government (Department of Justice), holds federal pre-trial detainees as well as persons in immigration custody.  **Exhibit G** (Rhode Island General Laws §45-54-1); **Exhibit H** (Inter-governmental agreement).

      8.      Wyatt does not have a formal medical infirmary with hospital beds.  Deposition of Bonnie White, taken December 20, 2017 ("White Dep.") **(Exhibit I)**, at 46.

      9.      However, Wyatt does have a medical unit which contains two exam rooms, a nursing station, a dental facility, a room containing medical records, a pharmacy area, two utility rooms used for storing supplies and taking simple blood samples, office space for the medical administrator, the nurse practitioner and the staff member responsible for scheduling outside appointments, and a break room.  Deposition of Dr. Edward Blanchette, M.D., taken March 30, 2017 ("Blanchette Dep.") **(Exhibit J)**, at 28-29.

      10.      The medical unit also has four rooms for housing patients who may be in need of closer medical observation.  Ex. J (Blanchette Dep.), at 29, 31.

      11.      Upon intake plaintiff was examined by a nurse in the medical unit.  Ex. A (Complaint), at ¶III(9); Ex. I (White Dep.) at 7-9.

      12.      The intake notes state that plaintiff was complaining about right shoulder pain, that no deformity was noted and that plaintiff was given Tylenol 650 mg per protocol.  **Exhibit K** (Intake Note); Ex. I (White Dep.), at 10, 13, 14.

      13.      A progress note from January 14, 2011, states that plaintiff was complaining of right shoulder pain since intake; the assessment was a possible dislocation of the right shoulder; and the plan was to transport plaintiff to a nearby hospital emergency department for evaluation.

**Exhibit L** (progress note).[1]

14.     Consistent with the plan, plaintiff was seen on January 15, 2011, at the emergency room of Memorial Hospital, located in Pawtucket, Rhode Island. **Exhibit M** (Offsite Health Care Report). He was diagnosed with a right shoulder "Type III ACJ injury." *Id.* The plan, as described in the Offsite Health Care Report, was for plaintiff to wear a sling for 10 days, take Motrin 800 mg as needed, and be re-evaluated in 7-10 days. *Id; see also* Ex. I (White Dep.), at 15.

15.     Wyatt does not have in-house orthopedic specialists on staff. Rather, the in-house medical staff consists of primary care physicians, a nurse practitioner, registered nurses and a health care administrator. Ex. J (Blanchette Dep.), at 24-29.

16.     The cost for outside medical care – such as a visit to an orthopedic specialist – is borne by the U.S. Marshals Service, not by Wyatt. Deposition of Robert Cuzzupe, taken December 20, 2017 ("Cuzzupe Dep.") **(Exhibit N),** at 6; Deposition of Linda St. Pierre, taken August 23, 2017 ("St. Pierre Dep.") **(Exhibit O)**, at 38.

17.     The U.S. Marshals Service pays for the cost of outside health care regardless of whether it is needed on an emergency basis, or whether it is scheduled ahead of time. Ex. N (Cuzzuppe Dep.), at 6-7; Ex. I (White Dep.) at 20.

18.     However, for a non-emergency outside health care visit, Wyatt must first seek approval from the U.S. Marshals Service. Ex. H (Inter-governmental agreement); Ex. O (St. Pierre Dep.), at 24, 34; Deposition of Dr. John Miskovsky, taken June 13, 2017 ("Miskovsky Dep") **(Exhibit P)**, at 38; Ex. I (White Dep.), at 27-28.

19.     On January 25, 2011, Wyatt submitted a "consultation request" to the U.S.

---

[1] The single-page progress note annexed as Exhibit L also contains entries dated January 24, 2011, January 26, 2011, February 17, 2011 and April 25, 2011.

Marshals Service for authorization to send plaintiff to an outside orthopedic specialist for additional evaluation of his right shoulder. **Exhibit Q** (Consultation Request); Ex. I (White Dep.), at 22.

20.     On February 10, 2011, there is a notation on the consultation request that Wyatt was still waiting for approval from the Marshals Service. Ex. Q.; Ex. I (White Dep.), at p.22.

21.     Meanwhile, on February 11, 2011, plaintiff was seen in the medical unit at Wyatt. Ex. L (progress note).  His use of the sling was discussed, and plaintiff admitted to taking it off to move his arm.  He was also shown exercises to use from Memorial Hospital and "advised on the importance of using exercises." *Id.*.

22.     On April 20, 2011, plaintiff was seen in the health service unit at Wyatt.  Ex. L (progress note).  He complained about an upset stomach from using Motrin, and was switched to Tylenol. *Id.*

23.     On May 16, 2011, the request for approval for outside orthopedic consultation was re-faxed to the Marshals Service.  Ex. Q (Consultation Request).

24.     On May 19, 2011, plaintiff was seen by in-house physician Dr. John Miskovsky. **Exhibit R** (progress note).[2]  Dr. Miskovsky noted that plaintiff had yet to be seen by the outside orthopedist.  He increased plaintiff's pain medication, and indicated he would attempt to speed up the orthopedic evaluation. *Id.; see also* Ex. P (Miskovsky Dep.) at 43.

25.     Based on his examination of plaintiff on May 19, 2011, Dr. Miskovsky did not believe that there was an urgent need for surgical intervention. Ex. P (Miskovsky Dep.), at 47.

26.      Sometime thereafter, approval from the Marshals Service was received, and an appointment with the Orthopedic Clinic at Memorial Hospital was booked for August 18, 2011.

---

[2] The one-page progress note annexed as Exhibit R also contains an entry from August 24, 2011 by Dr. Edward Blanchette.

6835233v.1

Ex. R (Progress Note).

27.     Wyatt does not control when the outside clinic is available to see any given patient, including patients who happen to be Wyatt detainees. *See* Ex. I (White Dep.), at 32-33.

28.     The August 18, 2011, progress note from Memorial Hospital states that plaintiff complained of pain in his shoulder and the surrounding muscles, and also of numbness and tingling down his right arm almost every day, occasionally to below the elbow. **Exhibit S** (Memorial Hospital Progress Note).

29.     The progress note suggested an MRI to further evaluate the AC joint, muscles and nerves; and physical/occupational therapy for range of motion, strength and muscle spasm. Ex. S (Memorial Hospital Progress Note). The note further states that surgery will likely be needed, "*although not urgent at this point*," noting further that "*if nerve impingement found on MRI may need surgery sooner*." *Id.* (emphasis added).

30.     Dr. Edward Blanchette was hired by CFDFC as independent contractor to work at the Wyatt Detention Facility in August 2011, although because of mandatory orientation programs, he did not start seeing patients until about the second half of August. Ex. J (Blanchette Dep.), at 12-13, 22.

31.     Dr. Blanchette met plaintiff for the first time on August 24, 2011. Ex. R (Progress Note). In his progress note, Dr. Blanchette noted the absence of atrophy, and Lehal's full range of motion on his exam. *Id.; see also* Ex. J (Blanchette Dep.), at 61:12-62:3. He also noted Lehal's claim of numbness, but believed that the claim was not consistent with his muscle effort when testing his right arm. Ex. R (Progress Note).

32.     Dr. Blanchette did not follow the recommendation for physical therapy. Ex. J (Blanchette Dep.), at 66-69. Dr. Blanchette did not follow the recommendation for physical

therapy because he believed he was in a better position, in an institutional setting, to view

plaintiff over a period of time, as opposed to a "snapshot" view during an appointment with an

outside specialist.  *Id.*  The decision not to order physical therapy was based on Dr. Blanchette's

observations of plaintiff from his initial consultation as well as in the following days.  *Id.* at 69.

33.    While Dr. Blanchette did not order physical therapy for plaintiff, he did follow the

orthopedic consultant's recommendation for an MRI.  On August 24, 2011, *i.e.,* the same day

that he saw plaintiff, Dr. Blanchette filled out a consultation request form for an MRI of the right

shoulder.  **Exhibit T** (consultation request).

34.    At some point thereafter, approval from the Marshals Service was granted and the

appointment was booked.  Ex. T (consultation request).

35.    On September 14, 2011, in anticipation of the MRI test, plaintiff filled out an

"MRI Screening Form," which was then faxed to Rhode Island Medical Imaging.  **Exhibit U**

(MRI Screening Form).

36.    Plaintiff had the MRI of his right shoulder at Rhode Island Medical Imaging on

September 28, 2011.  Ex. I (White Dep.), at 43.

37.    The report of the MRI report notes a "Type III acromioclavicular joint separation

with associated fracture, of the distal clavicle."  It further states "[n]o evidence of rotator cuff

tear," and that if there is persistent numbness/weakness an "MRI of brachial plexus" should be

considered.  **Exhibit V** (MRI report).

38.    Five days later, on October 3, 2011, Dr. Mizkovsky issued a consultation request

to the Marshals Service for approval for an MRI of the brachial plexus.  **Exhibit W**

(Consultation Request); Ex. P (Miskovsky Dep.), at 58; Ex. I (White Dep.), at 44.

39.    Approval from the Marshals Service was obtained on or about October 26, 2011

and an appointment for the MRI was booked. Ex. W (Consultation Request).

40. The MRI of plaintiff's right shoulder brachial plexus was performed at Rhode Island Medical Imaging on November 7, 2011. **Exhibit X** (MRI report). The MRI report states: "1. No abnormalities are identified within the brachial plexus" and "2. AC separation, unchanged from the prior shoulder MRI." *Id.*

41. Neither the MRI report dated September 28, 2011, nor the one dated November 7, 2011, indicated that a surgical repair of plaintiff's AC separation was needed on an urgent basis. Ex. S; Ex. U.

42. Three days later, on November 10, 2011, Dr. Blanchette saw plaintiff for an evaluation. **Exhibit Y** (progress note).

43. Dr. Blanchette's progress note from November 10, 2011 records the results of the second MRI; *i.e.,* that there were no abnormalities noted in the brachial plexus nerve complex. Ex. Y (Progress Note). The note also indicates that plaintiff told Dr. Blanchette that he might be transferred out of Wyatt by January or February 2012. The note states: "If so, I cannot schedule his elective surgery to correct his A-C separation before this time." *Id.* Dr. Blanchette did not see any medical problems associated with a "modest delay to surgically correct the problem in a more appropriate setting, e.g., formal 'hospital type infirmary.'" *Id.*

44. Plaintiff was sentenced on December 1, 2011. **Exhibit Z** (Letter from David A. Monaghan, Esq.). According to the letter from plaintiff's attorney to Wyatt dated December 5, 2011, he "anticipate[d] that [plaintiff] will be transferred from the Wyatt Detention Facility to a Bureau of Prisons Facility shortly." *Id.*

45. Dr. Blanchette saw plaintiff next, and for the last time, on December 6, 2011. **Exhibit AA** (Progress note). During the consultation, plaintiff told Dr. Blanchette that he had

been sentenced to five years and would be transferred to another facility in the near future. *Id.*
The progress note states: "The orthopedic surgeons cannot see this [patient] in their offices and
then perform the required surgery in this time frame. However, I have been assured by the
orthopedic specialist that there are no anticipated problems waiting this extra time before a
surgical repair has been performed." *Id; see also* Ex. I (White Dep.), at 48.

Plaintiff's Transfer to FCI Fairton and his Surgical Repair

46.     Plaintiff was transferred out of Wyatt on December 9, 2011, at 12:06 p.m.,
whereupon custody was transferred to the Federal Bureau of Prisons. **Exhibit BB (**Release
form).

47.     Thereafter, plaintiff was incarcerated at the Federal Correctional Institute in
Fairton, New Jersey ("FCI Fairton"). Ex. A (Complaint), at ¶III(17).

48.     On May 17, 2012, a "medical consult review" was submitted to the FCI Fairton
Utilization Review Committee regarding plaintiff's surgery. **Exhibit CC** (memo from Ruben
Morales).

49.     On July 31, 2012, plaintiff's consult for "arthroscopy-shoulder" was approved,
with a priority of: "Medically Necessary – Non-Emergent." *Id.* Ex. CC (memo from Ruben
Morales).

50.     Plaintiff's surgery was originally scheduled for September 25, 2012, but had to be
cancelled because the surgeon assigned to perform the surgery, Dr. Packman, was retiring.
**Exhibit DD** (Fax from Dexie Vandergraph).

51.     The surgery was then scheduled for November 9, 2012, but the procedure did not
go forward on that date either. Ex. DD (fax from Dexie Vandergraph).

52.     The surgery was finally performed on February 8, 2013, by Dr. Jennifer L.

6835233v.1

Vanderbeck, M.D. **Exhibit EE** (Dr. Vanderbeek operative report).

Plaintiff Submits his Second-Amended Complaint for Filing on January 22, 2015

      53.     In or about March 2014, plaintiff was transferred to the Federal Correctional Facility in Allenwood, Pennsylvania ("FCI Allenwood"), where he remained incarcerated until his release in November 2016. **Exhibit FF** (Medical Record showing transfer date).

      54.     Defendants obtained documentation from the FCI Allenwood mailroom pertaining to plaintiff during the period December 2014 to February 2015 pursuant to a FOIA request. *See* Declaration of Lalit K. Loomba, at ¶34; **Exhibit GG** (mailroom documents).

      55.     Outgoing prisoner legal mail is handled as follows at FCI Allenwood. Mailroom staff do not open outgoing legal mail for inspection. Instead, mailroom staff stamp the outside of the envelope and then place the envelope into outgoing mail. *See* Declaration of Bradford Vegh, dated February 5, 2018) ("Vegh Decl.") (**Exhibit HH**), at ¶4.

      56.     The stamp marks the date on which the outgoing legal mail is received by mailroom staff for mailing. The envelope is picked up by the U.S. Postal Service that day, or at the latest, the next business day. Ex. HH (Vegh Decl.), at ¶4.

      57.     The procedure described above was in effect during the period December 2014 to January 2015, and remains in effect to present. Ex. HH (Vegh Decl.), at ¶5.

      58.     The documentation produced pursuant to the CFDFC Defendants' FOIA request is a copy of mailing records from FCI Allenwood during the period December 2014 through February 2015, redacted to show only entries pertaining to then inmate Shawn S. Lehal. Ex. HH (Vegh Decl.), at ¶6.

      59.     These records are maintained and kept in the ordinary course of business of FCI Allenwood. Ex. HH (Vegh Decl.), at ¶6.

60.     The first four pages of the exhibit actually reflect two entries.  The first shows that inmate Lehal received an envelope from the U.S. District Court in New Haven, CT, on December 22, 2014.  The second shows that inmate Lehal received an envelope from Debra Freeman, United States Magistrate Judge, on February 2, 2015.  Ex. HH (Vegh Decl.), at ¶7.

61.     The fifth and seventh pages reflect mailings by inmate Lehal to the U.S. Patent and Technology Office and the Clerk's Office, 141 Church Street, New Haven, CT respectively.  Ex. HH (Vegh Decl.), at ¶8.

62.     The sixth page is a copy of the outside of an envelope containing legal mail addressed by inmate Shawn S. Lehal to "Office Pro Se, 500 Pearl Street, New York, NY 10007."  Ex. HH (Vegh Decl.), at ¶9.

63.     The date stamp on the envelope on the sixth page– January 22, 2015 – reflects the date that the envelope was received by the mailroom at FCI Allenwood for mailing.  Pursuant to the standard procedure described above, the envelope would have been placed in the mail, and picked up by the U.S. Postal Service, that day, or at the latest, the next business day.  Ex. HH (Vegh Decl.), at ¶10.

64.     The envelope containing plaintiff's Second-Amended Complaint was received in the Pro Se Office of the United States District Court for the Southern District of New York on January 28, 2015, and filed on the docket of this case that day.  *See* Docket Entry No. 61.

65.     The last page of the second-amended complaint filed at D.E. 61 is an image of the same envelope that appears in plaintiff's mail long from January 2015.  *Cf.* D.E. 61, at p. 30 and Ex. GG (mail log), at p.6.

66.     On February 25, 2015, plaintiff wrote to the Pro Se Office to inquire about an amended complaint that he "*sent to the Pro Se Office one month ago.*"  D.E. 66 (emphasis

added).

Plaintiff's Application for Social Security Benefits

67.     Plaintiff was released from federal custody in or about November 2016.  Ex. B (Lehal Dep.), at 232.

68.     Shortly thereafter, plaintiff submitted a claim for social security disability benefits, which was assigned Case No. 4876098.  *See* **Exhibit II** (exemplar from social security disability file).

69.     In his application, Mr. Lehal claimed that he could no longer "socialize, relax without pain, sleep, work warehouses and construction jobs, have strength and mobility, [or] be happy." **Exhibit JJ** (activities of daily living).

70.     On or about June 16, 2017, plaintiff's application for social security disability benefits was denied, the report stating:  "Your condition results in some limitations in your ability to perform work related activities.  We have determined that your condition is not severe enough to keep you from working." **Exhibit KK** (notice of denial of application).

Plaintiff's Application for Worker's Compensation Benefits

71.     Sometime after applying for social security disability benefits on the grounds that he could no longer work "warehouses and construction jobs," plaintiff took a position as a laborer with Seamens Moving & Delivery, 4730 29th Street, Long Island City, NY   11101. **Exhibit LL** (C-3 form).

72.     On August 2, 2017, plaintiff suffered an injury while working for Seamens Moving & Delivery when a wardrobe toppled and struck plaintiff in the back of his head.  Ex. LL (C-3 form).

73.     On August 3, 2017, plaintiff -- represented by the law firm Finkelstein, Meirowitz

-12-

& Eidlisz, LLP, 11 Park Place, Suite 1508, New York -- filed a claim for New York Worker's

Compensation Benefits in connection with his August 2, 2017, injury.   **Exhibit MM** (Notice of

retainer and appearance).

74.     On October 19, 2017, the Workers Compensation Board issued a notice of

proposed decision, which by its terms becomes final on November 24, 2017 unless opposed by

Mr. Lehal, stating:  "At this time, the Workers' Compensation Board finds no evidence or

insufficient evidence that the claimant has a permanent restriction or loss of use as a result of this

injury.  Additional monetary awards, however, may be payable if the injury results in a

permanent restriction or loss of use of an extremity, or permanent facial disfigurement

(scarring)." **Exhibit NN** (notice of proposed decision).

Plaintiff's IME and Subsequent Examination Regarding Range of Motion in Right Shoulder

75.     Dr. Howard Luks, an orthopedic surgeon retained by the CFDFC Defendants as

an expert witness, examined Mr. Lehal on October 8, 2017.  Loomba Decl. at ¶¶44-45.

76.     During the examination, Dr. Luks measured the degree of active forward

elevation of Mr. Lehal's right and left shoulder. *See* Deposition of Dr. Loren Fishman, taken

January 10, 2018 ("Fishman Dep.") (**Exhibit OO**), at 67:15-68:25.

77.     Dr. Luks reported 160 degrees of forward elevation of the left shoulder, but only

100 degrees for the right shoulder.  Fishman Dep. (Ex. OO), at 68:19-25.

78.     Dr. Fishman, who was retained by plaintiff as an expert witness, testified that the

limitation in Mr. Lehal's ability to rotate his right arm beyond 100 degrees could be related to his

Grade III shoulder separation.  Fishman Dep. (Ex. OO), at 69:2-70:14.

79.     Dr. Fishman acknowledged that Mr. Lehal's performance on the right arm

forward elevation test was a function of volitional effort.  Fishman Dep. (Ex. OO), at 70:15-

74:14.

80.     On October 12, 2017, six days after plaintiff was examined by Dr. Luks, plaintiff

was examined by his own treating physician, Dr. Corinne Vanbeek. *See* **Exhibit PP** (Dr.

Vanbeek's medical records); Fishman Dep. (Ex. OO), at 74:15-75:15.

81.     On October 12, 2017, Dr. Vanbeek measured passive forward flexion (elevation)

of Mr. Lehal's right arm to be 170 degrees with 150 degrees of active forward flexion

(elevation). Ex. PP (Dr. Vanbeek medical records); Fishman Dep. (Ex. OO), at 75:13-76:2.

Facts Pertinent to Plaintiff's *Monell* Claim

82.     In its decision and order dated November 21, 2016 (DE 124), this Court dismissed

plaintiff's *Monell* claim against CFDFC to the extent it was based on (i) failure to train; (ii)

failure to supervise; and (iii) failure to screen. D.E. 123, at 25-29.  However, the Court found

that a *Monell* claim was sufficiently stated on the alleged theory that CFDFC had a

policy/practice of delaying medical treatment to minimize detainee costs and therefore increase

the facility's bottom line. *Id.* at 18-25.

83.     The basic premise of plaintiff's surviving *Monell* claim is that CFDFC delayed

plaintiff's medical care as part of a policy and practice of minimizing costs and maximizing

profits. *See* Ex. A (Complaint), at pages 7-10.

84.     CFDFC earns revenue by holding (*i.e.* detaining) inmates.  Specifically, CFDFC's

income is derived by housing detainees for which CFDFC is reimbursed at a *per diem* rate.  Ex.

O (St. Pierre Dep.), at 161:3-4.

85.     CFDFC does not pay for the cost of outside medical care for detainees. Ex. O (St.

Pierre Dep.), at 161:3-4; Ex. N (Cuzzupe Dep.), at 6:22-8:14.

86.     Outside facilities providing medical care for Wyatt Detainees bill the Marshals

6835233v.1

Service directly.  Ex. N (Cuzzupe Dep.), at 7:1-5.

87.     Similarly, the cost of detainee transportation for outside medical visits is paid for by the Marshals Service.  Ex. O (St. Pierre Dep.), at 79:16-22; 156:7-18; 31:23.  Wyatt bills the Marshals Service for the cost of guards which, for security purposes, accompany detainees during off-site visits.  *Id.* at 7:16-8:14.

88.     The cost of prescription medications is also covered by the Marshals Service.  Ex. O (St. Pierre Dep.) at 79:16-22; 156:7-18; 31:23.

89.     Finally, CFDFC does not control how long a detainee is held at its facility. Instead, CFDFC will receive notice from the Marshals Service, which will then pick up the detainee and transport him elsewhere.  Ex. O (St. Pierre Dep.), at 232-233.

90.     As Ms. St. Pierre testified, "It's the U.S. Marshal's detainee, so if they want them to be transferred, they would be transferred.  We would prefer to keep them because that's how we make our money is per detainee per day, so we would prefer to keep everybody.  However, it's the [M]arshal's discretion whether they leave the facility, [and] when they leave the facility." Ex. O (St. Pierre Dep.), at 232-233.

6835233v.1

Dated: White Plains, New York
       March 30, 2018

                                  Respectfully submitted,

                                  WILSON, ELSER, MOSKOWITZ,
                                  EDELMAN & DICKER LLP
                                  Attorneys for Central Falls Detention
                                  Facility Corporation and Dr. Edward
                                  Blanchette, M.D.

                                  _____
                                  Lalit K. Loomba, Esq.

                                  1133 Westchester Avenue
                                  White Plains, NY  10604
                                  (914) 323-7000
                                  Our File No. 10899.00252

-16-